UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE MARRERO

12 CIV 1248

GEORGIANNA SAVAS,

Civ. No.

*Plaintiff,*

-against-

VERIFIED
COMPLAINT

ZACHARIAS GEORGIOU PORTALAKIS,

Fraud
Conversion
Contract

*Defendant.*

Jury Trial Demanded

X

Plaintiff, Mrs. Georgianna Savas ("Mrs. Savas") alleges for her complaint, with knowledge as to her own actions and events occurring in her presence, and upon information and belief as to all other matters, as follows:

**NATURE OF THE CLAIMS**

1. Plaintiff Mrs. Savas is a lifelong resident of New York City. She is the 85 year-old sister of the deceased artist Theodoros Stamos ("Stamos".) Stamos was the youngest of the New York Abstract Expressionist painters and friend and contemporary of Rothko and others.

2. Stamos was born in (and was a lifelong resident of) New York City. His parents were Greek. He died at the age of 74, in 1997, leaving all of his paintings, other works of art and historical and personal papers in the United States to his

Complaint Savas v. Portalakis
Page 2 of 31

executrix and sister, Mrs. Savas.  He had also given many such works to her prior to his death.

3.  In 2008, Mrs. Savas, following the wishes of her brother, began to donate the works to American public museums — and many of his papers to the Smithsonian Archives of American Art.

4.  In his later years, Stamos had spent many summers in Greece.  In the years prior to his death, he was befriended by Defendant Zacharias Portalakis ("Portalakis"), a Greek stockbroker who was, and is, also an art collector.

5.  In 1995, Portalakis obtained a handwritten letter from the ailing Stamos purporting to appoint Portalakis as the sole "authenticator" of Stamos' works, and providing for copyrights and other property to be given to Portalakis presumably upon Stamos' death.  However, when Stamos created and executed a new will in late 1996, he revoked all prior devises.  Portalakis was not mentioned in the will.

6.  Prior to the period surrounding Stamos' death, Mrs. Savas did not know Portalakis.  After Stamos' death, Portalakis established a close relationship with Mrs. Savas and would constantly telephone her at her home in New York.  He repeatedly represented to her, as he had to Stamos, that he would establish a private museum to house Stamos works.  Later, Portalakis also offered to establish a foundation to hold the copyright to the works of Stamos and to create a catalogue raisonné.

7.  Over the next years from 2005 to 2010, Portalakis was able to obtain from Mrs. Savas the loan of a vast quantity of Stamos works and effects. He also obtained the loan of eleven drawings by Rothko. In addition, Portalakis was able to have Mrs. Savas to gift him three valuable paintings. In 2009, he was also able to obtain a conditional assignment to the copyrights of Stamos in the United States and elsewhere -- though specifically not with regard to Greece. The assignment was conditioned upon Portalakis holding the copyrights solely for the exclusive transfer to the proposed foundation. (The Greek copyrights were never in the possession of Mrs. Savas, having been otherwise bequeathed.) The museum was never built. The foundation was never fully established — never authorized to accept gifts such assignment of the copyrights.

8.  After learning of Portalakis' misuse of the copyrights for personal gain with regard to auction houses and art dealers in New York City, and suspecting something was terribly wrong, during 2011, Mrs. Savas began to ask for the return of the loaned works and personal effects. In response Portalakis initially acknowledged her ownership — and agreed to provide an accounting. Then, in January 2012, he refused to return the art works and other items to Mrs. Savas, claiming for the first time that she had "given" the property to him.

9.  In 2011, Mrs. Savas had revoked the conditional assignment of copyrights when she learned that Portalakis had used them for his own personal purposes — including his making threats to auction houses and dealers (including

threats sent to them in New York City) and filing harassing litigation against New York art dealers attempting to sell Stamos' works.  In addition, she determined the foundation had never been authorized.

10.  Mrs. Savas now realizes that she had been duped by a classic confidence game over many years and is the victim of a detailed, elaborate and brutal fraud.  As described below, in more detail, she seeks the return of the property, and declarations as to the assignment and copyright and other relief.

## Parties

11.  Plaintiff, Mrs. Georgianna Savas, is domiciled in New York City, within this District, with an address on West 70th Street, New York, NY 10023.

12.  Defendant, Zacharias Georgiou Portalakis is domiciled in Athens, Greece and has a business address at 8 Pesmatzoglou Street, Athens, Greece.  He is a stockbroker and is the owner of the brokerage firm, Zacharias G. Portalakis S.A., Member Of The Athens Stock Exchange.

## Jurisdiction

13.  This is a civil action brought under the *United States Copyright Act*, 17 U.S.C. § 101 *et seq*. seeking declaratory relief and injunction as to copyrights created in, and pertaining to works which were located in New York and elsewhere —- and which were conditionally assigned in the State of New York. The action also involves torts and breach of contract committed within the State of New York — and torts from without the State of New York but having an effect

Complaint Savas v. Portalakis
Page 5 of 31

herein — undertaken by a person who engaged in a persistent course of conduct in relation to those torts and otherwise within the State of New York and this District.

14.  Jurisdiction of this Court over the persons and matters herein exists pursuant to 28 U.S.C. § 1332 (diversity.)  Additionally and independently, this Court has subject matter jurisdiction over Plaintiffs' claims for declarations and injunction under the *Copyright Act* pursuant to 28 U.S.C. §§ 1331 and 1338(a), and § 2201; moreover, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's state law claims in that such claims arise out of the same series of acts and transactions as to be part of the same case or controversy.

15. This Court has personal jurisdiction over Defendant pursuant to, *inter alia*, New York Civil Practice Law and Rules §§ 301 and 302.

16. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and/or 1400(a) and other applicable provisions.

### Facts

17.  Approximately two years prior to Stamos' 1997 death, Portalakis represented to Stamos that he would help fund a retrospective at the National Gallery and Alexandros Soutzos Museum of Greece — where Portalakis was then a board member.   During those discussions, Portalakis obtained a 1995 handwritten letter from the ailing Stamos transferring to Portalakis the rights to act as the sole authenticator of Stamos' works, a transfer not recognized under either

Greek or United States law.   The same letter also allegedly would transfer copyrights and property to Portalakis.

18.   Stamos, however, did not name Portalakis in his will, which was drafted and executed in late 1996 revoking all prior wills.   That will was probated in New York City.

19.   In 1997, after Stamos' death, the National Gallery in fact held the Stamos retrospective and published a 500 page catalog.   Portalakis wrote a forward to that catalog and his brokerage firm was prominently featured in a frontispiece as the sponsor of the exhibition.   By virtue of his financing the exhibition, Portalakis was able to have included in the exhibition catalog many of his own Stamos works.

20.   After Stamos' death, Portalakis called Mrs. Savas at her home in New York City to discuss the possibility of Portalakis building a museum that would contain Stamos' works.   Over a period of time, he thereafter represented to Mrs. Savas that he had purchased a site in Greece for the museum.

21.   As a result, Mrs. Savas visited Portalakis.   He showed her the alleged site.   Portalakis represented that if she would loan Stamos' works of art and personal effects to him, he would build the museum at that location and place the loaned materials in the museum.   He also represented that he was the owner of over 250 of Stamos' works — and that he would place his own Stamos works in the museum as well.   As discussed, *infra*, the museum was never built.

Complaint Savas v. Portalakis
Page 7 of 31

22. In 2002, in the context of discussions regarding the museum that was to be built, Portalakis pressed Mrs. Savas to sell him two paintings at a nominal price. However, Mrs. Savas was determined to only use the Stamos works to meet her brother's wish to place the works in public museums.

23. Following further requests, and in anticipation of the creation of the promised museum, Mrs. Savas sent Portalakis the two Stamos paintings as "gifts." Writings from Mrs. Savas to Portalakis specifically denote these as gifts.

24. In or about the period of 2003-2004, Portalakis offered to privately publish Mrs. Savas' memoirs of Stamos: "Eyes on Stamos." Portalakis worked with Mrs. Savas and directed efforts — e.g. he directed Mrs. Savas on the taking of additional photographs of Stamos' still existing studio in New York. Portalakis also provided to Mrs. Stamos the handwritten 1995 authentication letter from Stamos to be reproduced in the book and provided information to her to include in the book, such as how he met Stamos. The book was "vanity" published in 2005. The publisher of the book is "ZACHARIAS G. PORTALAKIS S.A. MEMBER OF THE ATHENS STOCK EXCHANGE". Despite the fact that he had befriended Stamos for a short period at the end of his life, the book praised Portalakis effusively, mentioning him over 40 times.

25. In 2005, Mrs. Savas was contemplating her move from her townhouse to Stamos' nearby smaller apartment (which she now owned) where Stamos' works and effects had been kept while he was alive, and were still stored. Mrs. Savas

and her family had lived at 132 West 70th Street in their own townhouse for many years. (In approximately 1990, Stamos had moved to this small cooperative apartment just a few doors down from Mrs. Savas' house.) This apartment was inherited by Mrs. Savas. The apartment was completely filled with Stamos work, papers, and other memorabilia including items previously stored in a Stamos-owned townhouse that he had rented to others.) Portalakis was aware that Mrs. Savas had innumerable items in the New York apartment, and that eventually she would need to inventory and then transfer the items to a museum or other institution such as the Smithsonian Archives of American Art.

26. In August, 2005, Mrs. Savas had a stroke and was weakened for two months. This both had an impact upon her, and signaled to her that she could not always continue to act with her same energy and she now had to deal with the stored Stamos property. She and her husband had been planning to downsize, sell their townhouse, and move to the apartment.

27. At that time, Portalakis represented to Mrs. Savas that if she would loan the works of art and personal effects in Stamos' apartment to him, then he would pick them up, catalog them and store them for use in the museum which he continued to represent he would build soon.

28. Mrs. Savas agreed to loan the works on that basis.

29. Portalakis represented to Mrs. Savas that his assistant and New York City art agent (a Greek-American artist, Cristos Giannakos of 3 Mercer Street,

New York, NY (the" Agent")) would go to the Stamos apartment and Mrs. Savas's

home and take possession of, inventory and then arrange for the works to be crated

and shipped to Portalakis.   Portalakis represented to her that the agent had

regularly represented him in connection with the inspection, purchase and

shipping of paintings from New York to Portalakis.  Before this, Mrs. Savas knew

the Agent only as an acquaintance.

30.  The Agent did go to the Stamos Apartment and Mrs. Savas' home in

late 2005 or early 2006.   He then arranged with Portalakis' regular shipping

company, Soho Crates of New York City, to have their movers pick up and ship

the paintings.   Soho Crates acted as Portalakis' New York City crating and

shipping agent.

31.   The Agent helped Mrs. Savas with the selection and arranging

hundreds of works and items including many valuable paintings — on

approximately five occasions between March 2006 and 2007.   [Mrs. Savas also

provided works and papers for other shipments until 2010 — similarly collected

and shipped by Soho Crates — acting as agent and as a shipping agent for

Portalakis in New York City.]

32.  Between each collection and shipment of this sort, and many times

between March of 2006 and the present, Portalakis explicitly represented to Mrs.

Savas that: (1) these works were being loaned to him, (2) for the specific purpose

of showing in the Stamos museum to be built on the property she had been shown,

Complaint Savas v. Portalakis
Page 10 of 31

and (3) that they would be stored in high-quality storage until the museum was completed — or loaned for shows at reputable public museums in the interim as specified by Mrs. Savas.

33.   On each of these separate occasions, relying on the on-going representations of Portalakis between each shipment, Mrs. Savas allowed the Agent to take possession of, crate and ship the loaned art works and personal effects.

34.   Her reliance on the representations of Portalakis that this was to be a loan was entirely reasonable based on Portalakis' prior ability to arrange for a show at the National Gallery, his reputation in the art world and his having published Mrs. Savas' memoir of Stamos — as well as the fact that Portalakis was a major collector of Stamos' works and had represented that he was placing his own significant holding of Stamos' works in the museum.

35. Portalakis arranged in New York City for all of the moving, crating, and shipping expenses — as well as for the services provided by the Agent.

36.   As a result, under the supervision of the Agent, Soho Crates shipped approximately 10 shipments totaling of over 250 items to Portalakis.  The value of these works is over five million dollars.  Any one of the shipments exceeded $75,000 in value.

37.   Portalakis further represented that his Agent and his shipper would each inventory and catalogue the shipments and provide detailed bills of shipping.

Mrs. Savas placed great trust in Portalakis' representations and reasonably relied on the specific representation that he and his Agent were documenting the shipments and creating inventories of the shipped works in New York, before they were shipped.  Despite requests, including requests in 2011, she never received the inventories or any shipping records or manifests.

38. Even with these bulk shipments, Mrs. Savas still held over forty important Stamos works, many of which had been given to her by Stamos prior to his death.  These were works desired both by Mr. Portalakis and by American museums.  In 2008, Mrs. Savas  began the process of donation with the assistance of the Hollis Taggart Gallery and another dealer of New York City.  In addition, with the assistance of New York art dealers, in 2008 she contributed some documents and other memorabilia to the Smithsonian Archives of American Arts.

39.  Between 2009 and 2011, despite pressure from Portalakis, Mrs. Savas complied with Stamos' wishes to have his historically important paintings donated to major public museums in the United States.  She donated over 40 of these works with a combined value in excess of $3.5 million to American museums, some of which are in New York.  The New York museums were The Whitney Museum of American Art, the Munson Williams Proctor Arts Institute of Utica, New York, The Heckscher Museum of Art of Huntington, New York, and the Long Island Museum.  Other United State museum donations include the National Gallery of Art, the Chrysler Museum of Art, the Philadelphia Museum of Art, the

Complaint Savas v. Portalakis
Page 12 of 31

Los Angeles County Museum of Art, the Phillips Collection, the Norton Museum of Art, the Pennsylvania Academy of the Fine Arts, the Museum of Fine Art Boston, and The Museum of Fine Arts Houston.

40.  Each of these gifts was specifically evidenced by a writing — in the case of the museums, a deed of gift from Mrs. Savas to the museum. As is customary in the deeds of gifts from heirs to museums, Mrs. Savas would assign to the museums any copyrights she held in the works.  (Generally, the heirs of an artist own the copyrights to the works of the artist.)

41.  In September of 2010, Mrs. Savas' husband was diagnosed with pancreatic cancer, and told he would die within a year -- which is what occurred. In June of 2011, while working on the process of donating the works to the United States museums, Mrs. Savas had an accident in which she injured her hip.

42.  During this trying period, Portalakis again asked that Mrs. Savas give him one more important work: "Ancestral II."  (First he asked to buy the painting knowing that she would not sell the works, and then continued to press Mrs. Savas. Finally, she agreed to give it to Portalakis, as a gift.)  During the same time period, a representative of New York's Museum of Modern Art saw the painting Ancestral II at her apartment and asked to have it donated for display in the Abstract Expressionism Exhibit that was planned to open on October 3, 2010. Mrs. Savas asked for Mr. Portalakis to agree to let MOMA have the painting, but he angrily refused.

43. He again raised the issue of the museum he represented he would build very soon on the property he had showed her. So, still relying on the representation that Portalakis would build the museum and other representations, Mrs. Savas agreed to give "Ancestral II" to Portalakis, rather than to the museum. Once again Soho Crates of New York City took possession at her apartment. This gift to Portalakis was also documented by a writing.

44. Each and every gift by Mrs. Savas, both to the many museums and to Portalakis was evidenced by a donative writing. Except for the three documented, intended gifts of paintings to Portalakis (and Stamos' pallet), no other writings evidencing gifts of art works were ever executed by Mrs. Savas in favor of Portalakis.

45. Mrs. Savas desired to donate works to publicly administered museums, which hopefully would provide a tax deduction. She had no intent to and never executed any writing donating any works to Portalakis' hypothetical private museum — as it qualified in neither respect.

46. In 2008, Portalakis, now publicly representing that he was the largest collector of Stamos works in the world and was the sole authorized authenticator of Stamos works, attempted to exercise his "rights" under the legally meaningless 1995 letter from Stamos appointing Portalakis as the sole "authenticator" of Stamos' works.

47.   Relying upon this "right" in the 1995 letter, Portalakis, in 2008, initiated personal litigation against an auction house selling two Stamos works, claiming that the works were fakes. The works were owned by New York City art dealers. This litigation occurred shortly after Portalakis learned of Mrs. Savas' plans to donate works to museums. Then, Portalakis had his daughter, who worked for Sotheby's as an agent, come to New York and tell another New York dealer that these works were fakes.

48.   The auction house correctly pointed out (with regard to claims under the 1995 letter) that under both Greek and United States law (under the Visual Artists Rights Act of 1990) only the artist has the right to authenticate works while living; the right of the artist was non-transferrable — and, in any case, would have terminated upon death.

49.   In order to bolster his personal litigation position by obtaining control of the Stamos copyrights, in May 2009, Portalakis made representations to Mrs. Savas in yet another effort to obtain control of the copyrights. This time he represented to Mrs. Savas that he would establish an independent, government-approved entity to protect the copyrights Mrs. Savas held as the heir of Stamos.

50.   Portalakis represented that he would have the entity approved by government regulators — thus making it a "foundation" — and that it would act to protect the integrity of Stamos' works. To accomplish this, he asked Mrs. Savas to conditionally assign her copyrights in all of Stamos' work to him — one condition

being that it the use of the assigned copyright would be for the "exclusive benefit of the Theodoros Stamos Foundation" which was to be established — and a further condition that the rights would be transferred in a timely manner -- to that foundation approved by the Government.  He showed her draft bylaws that explicitly stated the entity would be operational (and thus would not be given the copyrights) until so approved.  (Because Stamos' will provided that any copyrights in Greece would go to a cousin of Stamos, the assignment would not (and could not) include copyrights in Greece — but *would* include the copyrights of Stamos works in the United States.

51.  Portalakis was aware that Mrs. Savas in May 2009 was in the process of selecting works for donation to American museums — including copyrights.

52.  Portalakis offered to pay for a New York lawyer.

53.  In May 2009, Mrs. Savas executed the conditional assignment in New York City.

54.  Portalakis represented, and the agreement reflects that these would be used by the foundation and thus, that he would not have any rights to use these copyrights personally.

55.  Portalakis withheld the fact from Mrs. Savas that he would almost immediately use these copyrights to perpetuate his personal litigation against the New York dealers, and that the validity of his personal right to "authentication" had been questioned.

Complaint Savas v. Portalakis
Page 16 of 31

56.  Portalakis promptly used the assignment in the existing personal litigation to attack the copyright with regard to the works of art being offered for sale by the two New York art dealers, referring to the 2009 assignment as the basis for his personal litigation — and his assertion therein was that the works involved were "fakes" and copies of other Stamos works for which Portalakis held copyrights.  Portalakis also argued that the 2009 Assignment conveyed to him the moral rights encompassed in the copyrights, and that such moral right included the right of authentication, though Visual Rights Artists Act of 1990 makes clear that such moral right is extinguished upon the death of the artist.

57.  In further breach of the conditional assignment agreement, Portalakis in 2010 sent notices to New York auction houses and dealers, fraudulently declaring that he personally was the owner of all copyrights world-wide in the works of Stamos.

58.  Thereafter, Mrs. Savas learned more about the personal use of the copyrights by Mr. Portalakis and understood this in connection with the fact that the museum, ten years later, still had not been built either.

59.  When Mrs. Savas learned of Portalakis' personal litigation regarding the works being sold by the New York art dealers, and questioned him, Portalakis represented to Mrs. Savas (when she was in New York) that he had not asserted any rights under the 2009 copyright assignment, and that the works offered for sale by the New York dealers were fakes.

60.  In March 11, 2011, at an opening of a Stamos show at ACA Galleries in New York City, several people notified Mrs. Savas about Portalakis' personal misuse of the copyrights.  Moreover, Mrs. Savas learned that other New York dealers and experts knowledgeable as to Stamos, and persons respected by Stamos and Mrs. Savas, that they had offered affidavits that the works were authentic and personally known by those dealers.

61.  Upon investigating the overall situation, Mrs. Savas learned that Portalakis never completed the requirements as to formation of the foundation although Portalakis had provided Mrs. Savas with By-Laws of the foundation and falsely represented to her in May 2011 that the Foundation was now officially approved and open. The directors of this alleged "foundation" as proposed by Portalakis now consisted of himself, Mrs. Savas, and members of the Portalakis family — with no representatives from academia or the art community.  Mrs. Savas then resigned.

62.  Mrs. Savas now also understands that the "foundation" had not been properly formed.

63.  Mrs. Savas now understands that not only had Portalakis misrepresented his actions and was affecting Stamos' reputation, but that he also had not created — and was not going to create — the private museum on the property she was shown.

64. Moreover, Mrs. Savas now understands that the copyright assignment as wielded by Portalakis is inconsistent with the many deeds of gifts by Mrs. Savas to the American museums — as the museums required that Mrs. Savas, as the heir of Stamos, assign the Stamos copyrights to the museums for the donated works. Thus, Portalakis' abuse of the copyrights injures both her gifts and the museums.

65. Mrs. Savas then notified Portalakis in writing that because he had failed to comply with the conditions of the 2009 assignment, she was terminating the conditional assignment.

66. Mrs. Savas also asked in writing that Portalakis return to her all of the Stamos works and other effects (such as personal notes and papers) that she had loaned for use in the yet-to-exist museum.

67. Portalakis, both in writing (and verbal statements to a mutual friend in New York) made representations to Mrs. Savas and other persons in New York that he would return the works and personal items. Mrs. Savas then wrote to Portalakis more insistently demanding the return.

68. In response, Portalakis retained a New York lawyer, Nicholas Patouris, to respond to Mrs. Savas and her son Jason, who was now helping her. Through that lawyer in New York, Portalakis wrote a letter to Mrs. Savas and Jason, in New York and sent it to them in New York, representing that the items would be returned.

69. Based on this representation, Mrs. Savas did not file suit for fraud and breach of the copyright assignment.

70. On January 6, 2012, Portalakis' New York lawyer, Patouris, again wrote Mrs. Savas and her son representing that on or about January 17, 2012, Portalakis would provide Mrs. Savas with "a full list of items in his possession that he wishes to return to your mother."

71. Based on this representation, Mrs. Savas did not file suit for fraud and breach of the copyright assignment.

72. Instead, on January 19, 2012, Attorney Patouris wrote a formal e-mail to Jason Savas. He did not agree to send the works and personal papers. Instead, Attorney Patouris stated that the works would only be given to the "rightful owner." and also failed to provide the promised inventory.

73. Mrs. Savas has since learned that on January 16, 2012, Portalakis stated that he, not Mrs. Savas, is the owner of the 233 works of art and memorabilia removed from Stamos' apartment and that he intends to transfer them to the phony "foundation."

74. Thus, in January 2012 Mrs. Savas learned for the first time that Portalakis now claims to own these works and personal papers.

75. At the same time Portalakis was acknowledging his possession of these 233 art works and other items (the "Acknowledged Art and Property"), he was silent to numerous other of the works loaned to him by Mrs. Savas (the "Missing

Complaint Savas v. Portalakis
Page 20 of 31

Works") which include the following which on information and belief are in the possession, custody or control of Portalakis:

| | |
|---|---|
| Stamos-Low Sun Box II | $350,000 |
| Stamos-Infinity Field-Lefkada Series: | $150,000 |
| Stamos-Mushroom | $35,000 |
| Stamos-Lobster | $150,000 |
| Stamos-Deer | $125,000 |

Eleven Mark Rothko Drawings, as known to Portalakis, Soho Crates, and Giannakos.

Stamos - Ten Wood Framed Drawings 24 x 21.

Other Works of Art, known to Portalakis, the Agent Soho Crates, and the Agent Giannakos.

76. Also in possession of Portalakis are the previously described works obtained as "gifts" by fraud.

Stamos-Ancestral II - $150,000

Stamos-Divining Rod: $100,000

Stamos-Watermelon and Claw $150,000

## COUNT ONE: FRAUD

77. Plaintiff hereby incorporates and includes by reference the factual averments herein.

78. Defendant Portalakis made hundreds of representations to Plaintiff Mrs. Savas after February 2006, while she was within the New York City, that:

A. The works and personal items located in New York City to be made available to him at her premises were being so supplied as a loan to a museum he would build on the property shown to Plaintiff; and

B. That upon collecting the works and personal papers in New York City, inventories would be made and shipping records created, which would be provided to Plaintiff.

79. Defendant is a powerful and influential businessman and collector who had befriended her brother, paid to have her book published and befriended her. He had also arranged for a major show that was important to her brother — demonstrating significant connections to and influence in the art world. Mrs. Savas' reliance was reasonable when she provided the loaned works and personal papers to Defendant at her premises in the State of New York. Thereafter, Defendant's agent caused the items to be selected, collected and removed from Plaintiff's premises — and thereafter shipped out of the State of New York.

80. In 2011 and 2012, Plaintiff discovered that the many, many representations made to Plaintiff in New York City were false, in that Portalakis:

Complaint Savas v. Portalakis
Page 22 of 31

A. since 2012, states that he owns the works and papers.

B. has refused to return the works and papers; and

C. has refused to provide shipping records or inventories created in the State of New York relating to items collected in and then shipped by him from New York.

81. Plaintiff is injured in the amount of damages equal to the value of the paintings and incidental amounts including costs and attorney fees in this action.

82. Plaintiff is injured in that she does not have an accounting of the paintings removed from her premises in New York or a list of items sent from New York.

83. As part of this fraudulent scheme, Defendant also represented that he was obtaining copyrights in Stamos' works for subsequent assignment to a government approved foundation.

84. Defendant intentionally misrepresented that he was not going to use those copyrights for his personal use, and in personal litigation, and to warn New York Dealers, auction houses and museums of his personal holding of those copyrights, and his assertions thereunder.

85. Plaintiff reasonably relied on his assertions.

86. Plaintiff was injured in that:

A. No such foundation has been timely approved, and

B. The copyrights have been misused for personal benefit

87. This misuse injures Plaintiff personally, her reputation, the legacy of her brother, and the gifts she has made to United States institutions — including those located in New York.

88. Plaintiff is injured in that the copyrights were created and existed until obtained by fraud in the United States, under U.S. copyright law. The do not relate to copyrights in Greece.   They are unique, and monetary compensation is insufficient to make her whole.

## COUNT TWO: BREACH OF CONTRACT
(Breach of Conditional Assignment of Copyrights)

89. Plaintiff hereby incorporates and includes by reference the factual averments herein.

90. The conditional assignment of copyright stated that it was conditioned on being for reassignment to a government-approved foundation.   It was also conditioned on this being done in a timely manner.

91. The agreement is breached in that the foundation was never approved - — and that the time for it to be so approved in a "timely" manner has passed.

92. The agreement is breached in that Defendant has used the copyrights, in places including New York, for personal purpose and to threaten New York entities.  It is further breached in that a foundation was not timely approved.

93. Plaintiff has been injured and the copyrights have not been returned to her. Continued use without injunction or declaration injures her and those to whom she has made gifts.

## COUNT THREE: RESCISSION
### (As to the Conditional Assignment of Copyrights)

94. Plaintiff hereby incorporates and includes by reference the factual averments herein.

95. The conditional assignment of copyright stated as a specific condition that it was solely for reassignment to a government approved foundation, and that this had to occur in a "timely" manner.

96. The agreement is breached in that the foundation was never approved. The breach is so central to the agreement that only rescission with provide adequate remedy.

97. The agreement is breached in that Defendant has used the copyrights, in places including New York, for personal purpose and to threaten New York persons and entities, and that the foundation was not approved in a timely manner.

98. Plaintiff has been injured and the copyrights have not been returned to her.

## COUNT FOUR: REFORMATION
### (As to the Conditional Assignment of Copyrights)

Complaint Savas v. Portalakis
Page 25 of 31

99.  Plaintiff hereby incorporates and includes by reference the factual averments herein.

100.  The conditional assignment of copyright stated that it was for reassignment to a government-approved foundation.

101.  The agreement is breached in that the foundation was never approved and the copyrights used for personal purposes.

102.  The agreement contains no revision or reversion provision in the event of such misuse.

103.  The agreement was drafted by counsel for Defendant and Defendant.

104.  Plaintiff has been injured if the contract is not reformed to include a necessary provision(s).

### COUNT FIVE: IMPOSSIBILITY
(Conditional Assignment of Copyrights)

105.  Plaintiff hereby incorporates and includes by reference the factual averments herein.

106.  The conditional assignment of copyright stated that it was for reassignment to a government-approved foundation.

107.  The agreement is breached in that the foundation was never approved.

108.  The agreement contains no revision or reversion provision in the event of such institution not being created.

Complaint Savas v. Portalakis
Page 26 of 31

109.  Plaintiff has been injured if the contract is not determined to be void for impossibility.

## COUNT SIX: BREACH OF DUTY OF
## GOOD FAITH AND FAIR DEALING
(Assignment of Copyrights)

110.  Plaintiff hereby incorporates and includes by reference the factual averments in herein.

111.  The implied covenant of good faith and fair dealing was violated as set forth above. Plaintiff was injured as set forth above.

## COUNT SEVEN: CONVERSION
(Works and Papers)

112.  Plaintiff hereby incorporates and includes by reference the factual averments herein..

113.  Defendant exercised dominion over the works and personal papers when, in 2012, he asserted ownership of works and papers as set forth above. . Plaintiff was injured as set forth above.

## COUNT EIGHT: ACCOUNT

114.  Plaintiff hereby incorporates and includes by reference the factual averments herein.

115. Defendant obtained possession of the works and personal paper under an agreement to do an accounting (inventory) of them in New York prior to shipping, and provide them to Plaintiff. He has not done so, and is in control of those documents and will not provide them to Plaintiff. Plaintiff was injured as set forth above.

## COUNT NINE: COPYRIGHT

116. Plaintiff hereby incorporates and includes by reference the factual averments in paragraphs herein.

117. Plaintiff possessed only copyrights for the U.S. and other places in the world — specifically excepting Greece. (Because of the Stamos bequest to a different party of the Greek copyrights, the Greek copyrights were not held by Plaintiff and are not involved in this action.)

118. Plaintiff's copyright claim is not merely incidental to the ownership and/or contractual rights. Although Portalakis apparently and incorrectly claims that the copyrights assigned to him for the foundation encompassed the moral right of authentication, yet pursuant to 17 U.S.C. § 106A(a) et. seq. the right of authentication belongs only to the author and terminates on the death of the author. Here the entire purpose of the condition in the transfers was to protect the copyrights from exactly the type of personal use by another, self-dealing and failure to commit the copyrights to a publicly regulated entity which would protect

a legacy and the works. Thus, the infringement/use and copyright protections sought, including the injunction and declaration, go to the heart of this action.

119. Defendants action's were a breach of a the most fundamental <u>condition</u> of the contract. The primary condition of the assignment was explicitly phrased to stop exactly this sort of self-use and personal exploitation. Finally, a specific condition was that such assignment and thus copyright protections begin in a timely manner. All of these explicit conditions have been violated and the copyrights are being misused for the exact opposite purpose set forth in explicit conditions.

120. In the alternative, if the condition is deemed to be a covenant, the infringement/breach is so material as to create a right of rescission as set forth, *infra*, above.

121. Notice of these claims and of this suit has been given to the U.S. Copyright Office.

122. Plaintiff, and the American museums affected, her family and her brother's legacy are being injured by such use of the copyrights and she asks for a declaration and injunction with regard to such misuse of the specific condition and the copyrights.

**WHEREFORE**, Plaintiff prays that the Court advance this matter to a trial by JURY and after so doing enter judgment and issue orders as to the Defendant for the following relief:

1. Damages in the amount of the works and papers obtained by Defendant on account of fraud, of not less than $5,000,000.

2. Punitive damages in the amount of two times actual damages, but not less than $10,000,000 on account of the torts being wanton, willful and part of a vicious confidence game played out over a long period against trusting, aged persons by a wealthy and utterly conscienceless — and coldly calculating "person."

3. In the alternative, specific performance, requiring the return of the works and papers.

4. An order determining that the assignment contract is breached, void for impossibility, reformed to return the copyrights to Plaintiff and/or subject to rescission.

5. Declaratory relief with regard to the copyrights as set forth herein.

6. An injunction against the illegal assertion of the copyrights in the United States, and more particularly within the State of New York.

7. An accounting of all works of art, personal effects collected by Defendant in New York and the shipping manifests that were prepared -- and copies of which are in New York.

Complaint Savas v. Portalakis
Page 30 of 31

4. All costs of obtaining and/or executing the above relief

5. All allowable costs and fees.

6. Any and other relief the Court may deem allowable or just.

## JURY TRIAL

A jury trial is demanded.

**Dated:**  February 15 2012
New York, New York

Alan D. Sugarman
(ADS-1209)
17 West. 70th St.
Suite 4
New York, NY 10023-4544
212-873-1371
sugarman@sugarlaw.com

*Attorney for Plaintiff*

Complaint Savas v. Portalakis
Page 31 of 31

## VERIFICATION

STATE OF NEW YORK, COUNTY OF NEW YORK::          ss.

I **GEORGIANNA SAVAS**, am the Plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The contents are true to my own knowledge except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

Plaintiff's Signature

Subscribed and Sworn to
before me on February 17, 2012.

DACIA McKENZIE
Notary Public, State of New York
Qualified in Queens County
No. 01MC6134860
My Commission Expires 10-11-2013

9/17/2012

NOTARY PUBLIC