**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

—————————————————————   X

**GEORGIANNA SAVAS,**                          **12-cv-1248 (VM)**

                    *Plaintiff,*                 **ECF CASE**

-against-

**ZACHARIAS GEORGIOU PORTALAKIS,**

                    *Defendant.*

—————————————————————   X


—————————————————————————————

**MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANT'S MOTION TO DISMISS**
—————————————————————————————


                              **Alan D. Sugarman**
                              17 West. 70th St., Ste. 4
                              New York, NY 10023-4544
                              Phone: 212-873-1371
                              sugarman@sugarlaw.com

*Of Counsel*                          *Attorney for Plaintiff*
Carl J. Hartmann III, Esq.

June 8, 2012

Opposition to Defendant's Motion to Dismiss

# Table of Contents

Table of Contents.................................................................................................................ii

Table of Authorities ...........................................................................................................iii

Table of Declarations and Exhibits....................................................................................iv

I.    INTRODUCTION..........................................................................................................1

   A.   Defendant has Plaintiff's Property .............................................................................1
   B.   Issues related to the 2009 Copyright Assignment are unrelated to the
non-returned Art Works ........................................................................................................2

II.   Facts ...............................................................................................................................4

   A.   1995-2009 ...................................................................................................................4
   B.   2011 to Present...........................................................................................................8

III.  Long-Arm Jurisdiction ...........................................................................................13

   A.   Under 302(a)(3)(i) Defendant "commit[ed] a tortuous act without the state causing injury to [plaintiff] within the state" and  also  "engage[d] in other persistent course of conduct. . ." within the State...................................................................................................................................14
   B.   Under CPLR 302(a)(1) Defendant has "transact[ed] ... business within the state" ..............17
     1.   Transacted business in the State by Warnings based on the 2009 Assignment................17
     2.   Entered Into Contracts within the State related to the copyright  claims..........................18
   C.   Under 302(a)(2) Defendant, by his own acts and the acts of his agent,
"commit[ed] a tortious act within the state" .....................................................................18

IV.   Prior Actions, Forum Non Conveniens and Statue of Limitations .................20

   A.   There is no prior litigation in Greece .......................................................................20
     1.   The Pre-2012 Litigation..............................................................................................20
     2.   The 2012 Litigation.....................................................................................................20
       a)   The Escrow Ex Parte Application of January 10, 2012 .................................20
       b)   The New Case Served May 29, 2012...........................................................22
   B.   Forum Non Conveniens ............................................................................................23
   C.   Statute of Limitations...............................................................................................24

V.    Conclusion ..................................................................................................................25

Opposition to Defendant's Motion to Dismiss

---

## Table of Authorities

**Cases and Authorities**

Bank Brussels Lambert v. Fiddler Gonzalez, 305 F.3d 120 (2d. Cir. 2002)...................... 16

Cenage Learning, Inc. v. Buckeye Books, 531 F.Supp.2d 596 (S.D.N.Y. 2008) .............. 17

Colorado River Water Conservation District v. United States, 424 U.S. 800, 817, 96 S.Ct.
1236, 1246, 47 L.Ed.2d 483 (1976) ............................................................... 22

Compagnie des Bauxites v. Insurance Co. of N. Am., 651 F.2d 877 (3d Cir. 1981).......... 22

Croskey v. Medical and Technical Services, Inc., 2006 WL 2347816 (S.D.N.Y. 2006)..... 16

David Tunick, Inc. v. Kornfeld, 813 F.Supp. 988 (S.D.N.Y. 1993) ..................................... 16

DirecTV  v. Park 610, LLC., 691 F.Supp.2d 405 (S.D.N.Y. 2010) ..................................... 14

Donovan v. City of Dallas, 377 U.S. 408, 84 S.Ct. 1579, 12 L.Ed.2d 409 (1964)........ 22, 23

Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 104 S.Ct. 1868, 80
L.Ed.2d 404 (1984)....................................................................................... 15

JP Morgan Chase Bank, N.A. v. Law Office of Robert Jay Gumenick, P.C., 2011 WL
1796298 (S.D.N.Y. 2011) ............................................................................ 13

Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 527 N.Y.S.2d 195, 1 522 N.E.2d 40 (1988)
........................................................................................................................ 18

Laker v. Sabena, 731 F.2d 909 (D.C. Cir. 1984 ............................................................... 22

Moskowitz v. La Suisse, Societe D'Assurances sur la Vie, 2012 WL 1080125 (S.D.N.Y.
2012) ........................................................................................................... 23

Owens v. Freeman, 65 A.D.3d 731, 884 N.Y.S.2d 791 (3d Dep't, 2009), leave to appeal
dismissed 13 N.Y.3d 855, 891 N.Y.S.2d 688, 920 N.E.2d 93...................................... 19

Pearson Education Inc., v. Shi, 525 F.Supp.2d 551 (S.D.N.Y. 2007)................................. 18

Princess Lida of Thurn & Taxis v. Thompson, 305 U.S. 456, 59 S.Ct. 275, 83 L.Ed. 285 22,
23

SA v. UBS PaineWebber Inc., 25 A.D.3d 315, 807 N.Y.S.2d 58 (1st Dep't 2006)............. 25

Saphir Intern SA v. UBS PaineWebber Inc., 25 A.D.3d 315,  807 N.Y.S.2d 58 (1st Dep't
2006) ............................................................................................................ 25

**Statutes**

17 USC § 106A .................................................................................................................... 4

CPLR § 302(a) ................................................................................................................... 14

CPLR 302(a)(1).................................................................................................................. 17

New York Civil Procedure Law and Rules ("CPLR") § 302(a) ........................................... 13

## Table of Declarations and Exhibits

Opposition to Defendant's Motion to Dismiss

**Plaintiff's Supporting Declarations**

Declaration of Plaintiff Georgianna Savas

Declaration of Jason Savas

Declaration of Vivian Bullaudy

**Plaintiff's Exhibits (Attached to the Declaration of Georgianna Savas)**

Pl.Ex. 1 - Letter dated September 12, 2011 from Portalakis to Savas

Pl.Ex. 2 - Email dated January 6, 2012 from Nicholas Patouris to Jason Savas

Pl.Ex. 3 - Letter dated July 27, 2001 from Georgianna Savas to Kafetsi of
        The National Museum of Contemporary Art

Pl.Ex. 4 - Open letter June 13, 2009 Portalakis to Louis Meisel

Pl.Ex. 5 - Email dated January 19, 2012 from Patouris to Jason Savas

Pl.Ex. 6 - Letter dated April 14, 2010 from Portalakis to Tate Dougherty
        of Bonham's Auction House in New York

Pl.Ex. 7 - Photograph of Box No 12 from Exhibits to Escrow Application & New Greek Complaint

Pl.Ex. 8 - Photograph of Box No 05 from Exhibits to Escrow Application & New Greek Complaint

Pl.Ex. 9 - Photograph of Box No 11 from Exhibits to Escrow Application & New Greek Complaint

Pl.Ex. 10 - Email dated March 12, 2012 from Michael Gitlin of Soho Crates to Sugarman

Pl.Ex. 11 - National Gallery Stamos  Retrospective Catalog September 30, 1997, Front Pages

Pl.Ex. 12 - Letter April 10, 2009 Arthur A Mannarino to Vasiliki E. Betsou

Pl.Ex. 13 - Email May 6, 2009  from Arthur A Mannarino to Vasiliki E. Betsou

Pl.Ex. 14 - Letter May 8, 2009 Arthur A. Mannarino to Vasiliki E. Betsou

Pl.Ex. 15 - Donation Documents to Whitney Museum December 16, 2009

Pl.Ex. 16 - Donation Documents to Pennsylvania Academy of the Fine Arts October 3, 2010

Pl.Ex. 17 - Letter dated May 11, 2011 from Georgianna Savas to Portalakis

Pl.Ex. 18 - Cover Note to Letter dated May 11, 2011 from Georgianna Savas to Portalakis

Pl.Ex. 19 - Translation to Greek by Morfy Gikos of May 5, 2011 letter.

Pl.Ex. 20 - Letter dated August 28, 2011 from Georgianna Savas to Portalakis

Pl.Ex. 21 - Letter dated September 21, 2011 from Arthur A. Mannarino to Portalakis

Pl.Ex. 22 - Letter dated September 27, 2011 from Georgianna Savas to Vasiliki E. Betsou

Opposition to Defendant's Motion to Dismiss

Pl.Ex. 23 - Letter dated October 5, 2011 from Portalakis to Jason Savas

Pl.Ex. 24 - Letter dated October 3, 2011 from Arthur A. Mannarino to Portalakis

Pl.Ex. 25 - Email dated October 19, 2011 from Jason Savas to Nicholas Patouris

Pl.Ex. 26 - Email dated October 28, 2011 Patouris to Jason Savas

Pl.Ex. 27 - Letter dated November 5, 2011 from Georgianna Savas to Portalakis

Pl.Ex. 28 - Letter November 9, 2011 from Arthur A Mannarino Esq. to Nicholas Patouris Esq.

Pl.Ex. 29 - Email dated December 1, 2011 from Nicholas Patouris to Jason Savas.

Pl.Ex. 30 - Email dated December 20, 2011 from Jason Savas to Nicholas Patouris.

Pl.Ex. 31 - Email "Letter" dated December 31, 2012 from Georgianna Savas to Portalakis

Pl.Ex. 32 - Letter dated September 6, 2011 from Gina Savas to Portalakis dated September 6, 2011.

Pl.Ex. 33 - Gianakos Exhibition and Publication History - Alpha Delta Gallery Web Site.

Opposition to Defendant's Motion to Dismiss
Page 1

      This memorandum is submitted in opposition to Defendant's *Motion to Dismiss* [D.E. 9]

and supporting *Memorandum of Law* [D.E. 12], filed May 25, 2012.

## I.     INTRODUCTION

### A.     Defendant has Plaintiff's Property

      Despite Defendant's efforts to distract, this case concerns millions of dollars of art and

personal objects (the "Art Works") given or bequeathed by the New York artist Theodoros

Stamos ("Stamos") to his elderly sister (who lives in New York).[1]   Between 2006 and 2010,

Plaintiff ("Mrs. Savas") loaned[2] approximately 250 Art Works to Defendant in reliance upon

Defendant's fraudulent representations he would build a private museum with a wing to display

the works loaned by Mrs. Savas, along with the many Stamos works owned by Defendant.[3]   The

paintings were crated and then shipped by Soho Crates ("Soho") of New York City to Defendant.

The charges for crating and shipping were paid by Defendant.   Soho acknowledges that

shipments were made on behalf of Defendant.   Pl.Ex. 10 and Pl.Decl. ¶ 1.   It is not disputed that

the museum was never built and that there are no plans by Defendant to build such a museum.

      In 2011 Mrs. Savas asked for the return of the Art Works.   Defendant initially agreed to

return them, both in writing (Pl.Ex. 2) and in verbal communications through New York resident

Morfy Gikos, a life-long friend of Defendant's twin sister.   Pl.Ex. 23 and  Pl.Decl. ¶ 2.  Instead,

---

[1]  All of Plaintiff's exhibits (referred to as "Pl.Ex.") are appended to the *Declaration of Gina Savas in Support of the Memorandum in Opposition* which is referred to as "Pl.Decl.") Defendant Portalakis' Declaration is referred to as "Def.Decl."

[2]  There is one exception: two birthday "gifts" totaling 3 paintings, evidenced by written cards.

[3]   The disputed items include works of art by Stamos and other artists, as well as other personal memorabilia.   The non-returned works include five pieces by Rothko.   They are collectively referred to as "Art Works."   As detailed below, Defendant repeatedly promised to inventory the works (Pl.Ex. 2), but has never done so.   He has merely provided 78 pages of unidentified photographs of only the front of *some* of the Art Works — and characterized the photographs as a list. J.Savas Decl. ¶ 22.   There are no photographs of the backs of the paintings, where names of works, dates, signatures, and provenance labels frequently appear.   One must be an art expert to be able to ascertain that the five Rothko pieces are not in the photographs.

Opposition to Defendant's Motion to Dismiss
Page 2

in January 2012, Defendant for the first time made the claim that he owned the Art Works. There are no writings making or suggesting transfers or "gifts" to him.  Despite the fiction Defendant attempts to perpetrate, there are no writings that Mrs. Savas intended to give these Art Works to a (still-not-approved) foundation which Defendant was to create.  Foundation documents and a 2009 Copyright Assignment do not mention transfers of any art work to Defendant or the to-be-created foundation, Mrs. Savas or anyone else.  Discussion of the creation of a foundation came *after* the shipment of many of the Art Works to Defendant.  Pl.Decl. ¶ 3.

### B.   Issues related to the 2009 Copyright Assignment are unrelated to the non-returned Art Works

A second distinct issue concerns a 2006 copyright license superseded by a 2009 copyright assignment (the "2009 Assignment" or "Assignment") wherein Mrs. Savas first licensed and then assigned to Defendant interests in her copyrights to Stamos' works.[4]  Under Stamos' New York will, Mrs. Savas did not inherit the Stamos copyrights applicable within Greece.  The 2009 Assignment of these non-Greek copyrights was made, on its face, to Defendant solely for further transfer to a "government-approved" foundation that Defendant promised to establish, and only after such approval.  Pl.Decl. ¶ 4.

Defendant acknowledges that the purpose of the Assignment was to facilitate the creation a *catalogue raisonne,* and a foundation to do so.  The 2009 Assignment clearly provides *that the copyrights were not for his personal use*.  He acknowledges both of these conditions of assignment in his letter to Mrs. Savas dated September 12, 2011. Pl.Ex. 1.

As far as the copyrights are concerned, as the lawyer states very correctly, for the

---

[4] Plaintiff does not possess a complete copy of the original 2009 Assignment with all attachments, and Defendant has not provided such a complete copy.  The escrow application filed with Defendant's motion appends an altered version of the Assignment (Pl.Decl. ¶ 46 and Pl.Ex. 14) and includes an unexecuted version of the Assignment without attachments. Accordingly, Plaintiff does not acknowledge that the Assignment is a valid document.

Opposition to Defendant's Motion to Dismiss
Page 3

rest of the world except Greece, you gave them to me only to transfer them to the Stamos Foundation, and never to use them personally. This is anyway prohibited by the document of 13th May 2009.

*   *   *

I repeat, I have never used the copyrights in any court of law and for any reason. Even if I want to, I cannot use them personally.

Defendant now claims that this Court should not hear this case because those copyrights (and thus Mrs. Savas) are somehow involved in litigation in Greece initiated by Defendant.  However, Mrs. Savas is not a party, nor is any property of hers involved.  If Defendant used these assigned copyrights in litigation to which Mrs. Savas is not a party, he lied to her about it in the referenced letter and at many earlier times when he made similar statements to her.  Any use of the copyrights in litigation was not authorized and violated the express language of that Assignment. Finally, he has not started a *catalogue raisonne* and admits in his motion that the foundation has not been approved by the Greek Government.  Pl.Ex. 1 and Pl.Decl. ¶ 5.

There is no real relationship between the 2009 Assignment and the non-returned Art Works except that both were obtained by the same fraud.  Again, the 2009 Assignment makes no reference to transfers or gifts of art whatsoever — it concerns only copyrights. Pl.Ex. 14.  The only relationship between the Art Works and the copyrights is an *incredible, new fiction by Defendant*:  that the 2009 Assignment transferred art, and he now owns the art under that 2009 Assignment.  Pl.Decl. ¶ 6.

Mrs. Savas claims that Defendant fraudulently induced her to enter into the 2009 Assignment, and that subsequently, Defendant breached that Assignment.

Opposition to Defendant's Motion to Dismiss
Page 4

II.     **Facts**

   A.      **1995-2009**

Defendant met and befriended Mrs. Savas' artist brother at the end of Stamos' life, when

he was quite ill.[5]  Def.Decl. ¶¶ 20 and 22.  He died in 1997.  Stamos, a close friend and associate

of Rothko, was born and raised in New York.  He lived his entire life in New York except for

vacations in Greece, where he met Defendant.  Stamos only saw Defendant on those vacations.

G.Savas Decl. ¶7 and Def.Decl. ¶¶ 17-20.

During this period, Defendant attempted to obtain:  (1) control of Stamos' copyrights, (2)

a right to authenticate his works, (3) possession of a number of his works located in Greece, and

control of the Stamos *catalogue raisonne*.  Finally, in late 1995, a little over a year before

Stamos' death in 1997, Defendant persuaded Stamos to handwrite what was essentially a

holographic will.[6]  Pl.Decl. ¶ 8 and Def.Decl. ¶ 21.

Fifteen months later, Stamos executed his last will and testament.  It was a New York

will probated in New York. PL.Decl. ¶¶ 23-24.  As is usual, prior testamentary expressions were

revoked by the will.  The will devised all property (including the non-Greek copyrights) to Mrs.

Savas — except all property in Greece, which went to a cousin who lived in Greece.[7]  Pl.Ex. 1.

Despite Defendant's claim of intimacy, the will did not mention Defendant.  Pl.Decl. ¶ 9.

Defendant did not meet the Plaintiff, Mrs. Savas, until just before Stamos' death.

---

[5] Defendant claims that he paid for Stamos' health care.  Def.Decl. ¶ 20.  But Stamos suffered no
lack of funds.  Moreover, Defendant claims he purchased over 250 works of art directly from
Stamos.  Escrow application [D.E. 11-1] at 2.  If he had paid for those works, then Stamos
certainly would not have lacked for funds.  Pl.Decl. ¶ 47.

[6] The 1995 document purported to assign to Defendant copyrights and a right of authentication.
Also included was a promise of Defendant to Stamos to create the Stamos *catalogue raisonne*, a
project about which nothing has been heard for 17 years.  Def.Decl. ¶¶ 21-24 and Pl.Ex. 1.

[7] The right of authentication was not transferred to either Mrs. Savas or the cousin.  Under both
Greek and US law, only the artist is allowed to authenticate the works of the artist.  This right
may not be transferred to third-parties, or even to heirs.  17 USC § 106A, the Visual Artists
Rights Act of 1990.  Yiannopoulos Decl.  ¶ 36.

Opposition to Defendant's Motion to Dismiss
Page 5

Def.Decl. ¶ 22.  Defendant then set out to obtain the art and copyrights.  His moving papers aare clear that he felt he had been wrongly 'denied' by the will and that Mrs. Savas had talked Stamos into not providing for Defendant in the will.  Def.Decl ¶ 23-24.  He quickly befriended Mrs. Savas.  Pl.Decl. ¶ 10.  He was solicitous and charming, calling her in New York *hundreds of times*.  Pl.Decl. ¶ 11.  He held exhibits of his own Stamos works and made her an honorary guest at exhibits he held.  Def.Decl. ¶ 46.  He paid for publishing her memoir about Stamos, making sure that he (Defendant) was *extravagantly* praised in the book.  Def.Decl. ¶¶ 30-32.  He flattered her — and repeatedly and continuously promised that if she loaned the Art Works he would show them (along with numerous Stamos works he owned and showed to her) in a wing of a museum he represented he would build.  Pl.Decl. ¶ 12.

Defendant invited Mrs. Savas to Greece in 2002 to see the location he had purchased to build the museum.  They then discussed that location again in 2006 just before Defendant obtained the Art Works.  (In 2009 Mrs. Savas was invited to be an honorary guest at a Stamos show, and he told Mrs. Savas that the museum project was proceeding.  At this show he pressured Mrs. Savas to sign legal documents written in Greek with no translations.  Def.Decl. ¶¶ 46 and 47.)  Through the representations about the museum, Defendant obtained Mrs. Savas' devotion, the loan of the Art Works, and the assignment of the copyrights.[8]  Pl.Decl. ¶ 13. ¶

During the time period from July through October of 2006, Defendant, to obtain the loan of the Art Works, also represented that he would select, collect, ship, inventory and store the Art Works to be loaned to the museum.  Pl.Decl. ¶ 14. Both Mrs. Savas and her husband were ill and

---

[8] Vivian Bullaudy, Director of the respected Hollis Taggart Galleries, which from 2008 to 2011 arranged Mrs. Savas' donations to many U.S. Museums, states with reference to Defendant: "From my observations, he exercised unusual control over Mrs. Savas, and, I learned to make no criticisms of Mr. Defendant or in any way disagree with what he was influencing her to do." Vivian Bullaudy Decl. ¶ 11.

Opposition to Defendant's Motion to Dismiss
Page 6

were concerned about the future.  Defendant also represented that in order to select and move the

art to Greece, his agent for dealing with his art in New York, Mr. Cristos Gianakos, would come

and take the Art Works and arrange shipment by Defendant to Greece.  Mr. Gianakos had never

assisted Mrs. Savas with moving or shipping any art or with any other activity at any time —

ever.  The only times he ever came into her apartment were to ship the Art Works to Defendant.

Pl.Decl. ¶ 15.  It was well known that Mr. Gianakos had acted for Defendant many times in the

purchase and acquisition of art in New York City.[9]  As is discussed below, Mr. Gianakos was so

close to Defendant that, as Mr. Gianakos told several people, Defendant had paid a substantial

portion of the cost for Mr. Gianakos' daughter, Maia's, education at Vassar.  Pl.Decl. ¶16. and

J.Savas Decl. ¶¶ 3-6.  Defendant's gallery published an edition of works of Mr. Gianakos in

2003.  Pl.Ex. 33.  Gianakos omits reference to this publication in the *curriculum vitae* attached to

his Declaration herein.  J.Savas Decl. ¶ 7 and *Exhibit A* to Gianakos Decl. [D.E. 12-1].)

Mrs. Savas provided almost all of the Art Works in New York to Mr. Gianakos on

several occasions between October of 2006 and 2009 — beginning on October 15, 2006.

Pl.Decl. ¶ 17.  Defendant then shipped the objects from New York using Soho Crates ("Soho"),

which had previously shipped works for Defendant.  Pl.Decl. ¶ 18.  *Defendant has not disputed*

*in his Declaration or elsewhere that the items were picked-up from Plaintiff and that he paid the*

*pick-up, crating and shipping costs for those shipments.  Certainly Mrs. Savas knows and can*

*prove she did not pay those charges*.  Pl.Decl. ¶ 19.  Mrs. Savas never received any inventory of

the art shipped from Soho or Defendant.  Nor did Soho or Defendant supply Mrs. Savas with

copies of the U.S. customs declarations, which are required by law to indicate each work of art

---

[9] Defendant coyly declares Mr. Gianakos was not "employed by me or *designated* as my agent."
But, he does not state that he had not engaged Mr. Gianakos to provide art-related services to
him in New York City on many other occasions, or that Mr. Gianakos was not handsomely
compensated.

Opposition to Defendant's Motion to Dismiss
Page 7

and the size and value.  As the consignee of the Art Works, Defendant would, of course, also have copies of those U.S. Customs declarations.  Pl.Decl. ¶ 20.

The only time that Mrs. Savas was ever directly or indirectly involved with Soho and Mr. Gianakos concerned the shipment of the Art Works to Defendant.  She never used Soho Crates for her own shipping or for her loans to museums and galleries.  Pl.Decl. ¶ 21.  Neither Soho nor Mr. Gianakos were in any way involved in her moving and shipping loans of art to The National Gallery of Greece in 1997, the United States "Art in Embassies Program" in Athens 1998, the 70th Art Gallery in New York in 2000, the Queens Museum in 2000, shows in Greece in 2000, the Meisel Gallery in 2002, the Ashville Art Museum in 2002, Marymount in New York City in 2005, the Westchester Art Workshop in 2006, and the Hollis Taggart Gallery in 2010.  Nor were either involved in the handling and shipping of donated Stamos works to twenty U.S. museums from 2009 to 2011.  Mr. Gianakos was not there to help her with moving art from Stamos' home after his death or in moving art from her brownstone to Stamos' old apartment.   Gianakos and Soho only were on the scene on the occasions when the Art Work was being shipped to Defendant.  Pl.Decl. ¶ 22.

Mrs. Savas' son affirms that when he visited Soho recently, the shipper admitted that the shipping was done by and for Defendant — and that because Mrs. Savas was _not_ a client of the shipper she "[c]ould not be given the Defendant's documents."  J.Savas Decl. ¶ 8.  Similarly, repeated recent efforts to obtain the shipping information from Soho by Mrs. Savas' counsel have been to no avail.  J.Savas Decl. ¶ 9.  Photos of a few of the shipping labels, obtained from Defendant's court filings, show that the crates were sent by Soho, were addressed to Defendant's Athens shipping agent (Athanasios Bergeles) and had Defendant's name handwritten on the crates.  Some labels are blacked-out.  J.Savas Decl. ¶ 10 and Pl.Ex. 7, 8 and 9.  Mrs. Savas

Opposition to Defendant's Motion to Dismiss
Page 8

would have had no way of knowing Bergeles was the receiving agent or its address.   J.Savas Decl. ¶ 23.   Finally, despite Defendant's and Gianakos' Declarations, Soho admits that it had shipped art for Defendant.  J.Savas Decl. ¶ 9 and Pl.Ex. 10.

## B.      2011 to Present

By May of 2011: (1) the museum with a 'Stamos wing' was not being built or even planned, (2) the Greek government had not approved the Foundation, (3) the copyrights were being misused for Defendant's personal ends, rather than for the foundation and (4) the *catalogue raisonne* did not appear to have been started.  Pl.Decl. ¶ 24.  As Mrs. Savas later learned in 2012, the Greek Ministry of Finance declined to approve the Foundation as being underfunded — and had not reconsidered the application since then.[10]   (Contrary to Defendant's assertions, Mrs. Savas' first and only contact with the Ministry was in February, 2012 — after the fraud had been discovered.)  Pl.Decl. ¶ 25.

Because of this, on May 11, 2011 Mrs. Savas politely wrote to Defendant expressing concerns about the Art Works and the lack of the promised museum.  Pl.Ex. ¶ 17 and Pl.Decl. ¶26.  Mrs. Savas could not follow up on her requests for several months as she was bedridden for several weeks after a fall and her ill husband had taken a turn for the worse.  He died from cancer a few months later on August 20, 2011.  Pl.Decl. ¶ 26.  On August 28, 2011, Mrs. Savas again wrote Defendant, expressing grave concerns about learning that he was indeed using references to the Assignment to attempt to involve her in his Greek litigation.  Pl.Ex. 20 and Pl.Decl. ¶ 27.  On September 6, 2011, she again wrote, objecting to Defendant's personal use of the copyrights.  Pl.Ex. 32 and Pl.Decl. ¶ 28.

On September 12, 2011, Defendant responded with a long letter in English explicitly

---

[10] Yiannopoulos Decl. ¶ 37.

denying that he used the Assignment or copyrights in any litigation.  Pl.Ex. 1.  *He also admitted that the Assignment was not applicable to Greece or his Greek litigation, and that he had no copyrights in Greece.*

> As far as the copyrights are concerned, as the lawyer states very correctly, for *the rest of the world except Greece, you gave them to me only to transfer them to the Stamos Foundation, and never to use them personally*.   This is anyway prohibited by the document of May 13, 2009.  [Emphasis supplied.]

Defendant was also clear in stating to Mrs. Savas that he had not used the copyrights or Assignment in any court of law:

> I repeat, I have never used the copyrights in any court of law and for any reason. Even if I want to, I cannot use them personally.

Pl.Ex. 1 and Pl.Decl. ¶ 29.

Mrs. Savas, now fearing that the museum representations had been fraudulent, wrote Defendant on October 3, 2011, demanding a return of all of the Art Works stating:

> [It is] important that everything that I sent to you *to store for me* for the museum that was planned over 15 years ago, that has never happened, be returned to America. [Emphasis supplied.]

Pl.Ex. 1 and Pl.Decl. ¶ 30.  Defendant responded with another letter of October 5, 2011, this time to Mrs. Savas' son, Jason Savas, stating that Defendant had retained a New York attorney, Nicholas Patouris.  Pl.Ex. 23.  Defendant admits that mistakes were made but that Mrs. Savas simply did not understand the legal matters.

After weeks of efforts by Jason Savas to get together with Mr. Patouris, as suggested by Defendant (Pl.Ex. 26), he finally met alone with Mr. Patouris in the lawyer's New York office. J.Savas Decl. ¶ 11.  On November 5, 2011, when nothing was forthcoming from Patouris, Mrs. Savas again wrote Defendant, demanding the immediate return of the Art Works and asking for an inventory of all of her property he was holding.  Pl.Ex. 27 and Pl.Decl. ¶ 31.  Defendant and

Case 1:12-cv-01248-VM   Document 15   Filed 06/08/12   Page 15 of 31
Opposition to Defendant's Motion to Dismiss
Page 10

his New York counsel responded on December 1, 2011, with more misrepresentations, but failed to supply the property or the promised inventory.  Pl.Ex. 29 and  J.Savas Decl. ¶ 32.

Thus, Mrs. Savas' sole contact with Defendant's Greek litigation came on December 9, 2011, when she signed an affidavit in New York intended to make it clear that she was **not** a party to any Greek litigation.  She simply repeated the statement in Defendant's own letter of September 12, 2012, that he had admitted he did not hold Stamos' copyrights in Greece and also that she and her 2009 Assignment were, therefore, in no way involved in **any** Greek (or other) court proceedings.  Pl.Decl. ¶ 33.  Contrary to Defendant's moving papers, she absolutely did not travel to Greece or testify in court there.  Pl.Decl. ¶ 34.

On December 20, 2011, Mrs. Savas and her son continued their efforts to obtain the property (Pl.Ex. 30) and then sent another letter on December 31, 2011.  Pl.Ex. 31.

After five weeks of silence, on January 6, 2012, Defendant's New York counsel (Patouris) e-mailed promising a return of the items, and that, before January 17, 2012, a "full list" of the Art Works would be sent.  Pl.Ex. 2.

> I am writing at the request of my client in Greece to confirm the following:
>    1. He is confirming that on or about January 17, 2012, he will provide you with *a **full** list of the items in his possession that he wishes to return to your mother;*
>    2. On or about that date he will have completed photographing those items and will provide you with copies of those photographs.
>    3. He wishes to have this matter closed amicably and finally, as Morfy [Gikos, [11] a New York resident] has assured you.
> I will be in touch with you as soon as I hear from Greece. [Emphasis supplied.]

Instead, unbeknownst to Mrs. Savas, a few days later (on January 10, 2012) Defendant made an *ex parte* "application" in a local Greek municipal court of limited jurisdiction (with a maximum

---

[11]  Morfy Gikos is a friend of Defendant and lives in New York and was completely fluent in Greek and English.  She is also a friend of Mrs. Savas.  Defendant admits that he used Gikos as his intermediary in New York to communicate representations and messages regarding this matter to Mrs. Savas.  Pl.Ex. 1 and 23; and Pl.Decl. ¶ 48.

jurisdictional amount of 20,000 €) seeking only an *in rem* interim escrow by a museum as to just a portion of the Art Works held by Defendant.  Yiannopoulos Decl. ¶¶ 9, 24 and 25; and Pl.Decl. ¶¶ 12 and 13.  *In a patent falsehood made to allow Defendant to get into a court quickly, he represented to the magistrate that the value of all of the 233 works was under 18,000 €.*  [D.E. 11-1 at 8] and Def.Decl. ¶ 59.  He did not serve her or seek a determination of ownership in the application – nor could this court of limited jurisdiction entertain such matters.[12]  Yiannopoulos Decl. ¶¶ 7, 9, 24 and 25.  This application did not mention the approximately 17 other pieces held by him, including at least five and perhaps more Rothko drawings.  Pl.Decl. ¶ 37.  She first learned of his application in a Patouris e-mail nine days later.

In the application filed January 10, 2012 (attached to Defendant's motion at D.E. 11-1) Defendant stated, *for the first time ever,* his claim to **own** the approximately 233 pieces out of the approximately 250 Art Works.  Pl.Decl. ¶35.[13]  Defendant states in the application that his purpose in filing was to block any U.S. action by Mrs. Savas.[14]  Nine days later, on January 19,

---

[12] The escrow application does not include a request for determination of the rights of ownership of the Art Works or as to the validity of the Copyright Assignment.  [D.E. 11-1 at 10].  Although the *ex parte* Application recites the complete text of the 2009 Assignment, the escrow requested by Defendant had *nothing at all to do with the Assignment or copyrights but instead asked for relief only as to 233 of the Art Works, none of which are even mentioned in the Assignment.*

[13] For tax reasons, Mrs. Savas could not have given such works to a Greek entity without disastrous consequences.  Mrs. Savas had previously discussed with Defendant the fact that she had been unwilling to complete donations of Stamos paintings to The National Museum of Contemporary Art in Athens after the Museum advised her in 2002 that it did not and could not possess a U.S. tax-exemption.  Pl.Ex. 3.  Defendant knew that the promised museum and any Greek foundation could not have such a U.S. tax-exemption.  He also knew from this and other conversations that Mrs. Savas was fully aware of the applicability of U.S. gift taxes and thus could not give art of any value to a non-tax-exempt entity.  Defendant further knew that starting in 2008 Mrs. Savas, with the help of the Hollis Taggart Galleries, had been donating many of her important Stamos works to U.S. museums such as the Whitney, the National Gallery, and the Phillips Collection, gifts which *could* provide such tax relief.  Pl.Decl. ¶ 49 and Pl.Ex. 15 and 16.

[14] In the application, Defendant admits [DE 11-1] at 8-9, that he filed the application because:

> The party against whom the application is made advised me through a subsequent
> letter of hers that should I not comply with her (i.e. fail to restore the items to her),

2012, Defendant's New York attorney, Patouris, sent her an email advising that an "order" had been issued by a Greek court. He did not include any papers. He did not identify the court fully and did not provide the docket number for the case. He did not disclose that Defendant had changed his position and was now claiming ownership of the Art Works. He did not provide the promised "full list." Pl.Ex. 5 and J.Savas Decl. ¶ 36.

Mrs. Savas then hired New York litigation counsel. On February 17, 2012, she filed the instant *in personam* action naming Defendant as a party. Mrs. Savas served Defendant with the summons and complaint (with translations) three times, the first being completed on March 5, 2012.[15] On March 29, 2012, Defendant formally accepted service and requested additional time to answer. [D.E. 6.] He then sought and received more time to respond here. [D.E. 8.]

Defendant, *after* having been served, apparently realized his error in not starting an adversary action. So, on April 11, 2012, he filed an *in personam* complaint, not before that local Greek magistrate court where the application had been filed, but in a Greek court which (presumably) has subject matter jurisdiction. Yiannopoulos Decl. ¶¶ 12, 28. Defendant had realized, too late, that the escrow application was insufficient to determine the rights of the parties as to ownership of the paintings. *Id.* ¶ 28. Defendant then had his new complaint translated into a 55-page, single-spaced document, and on May 16, 2012, attempted to have it served upon Mrs. Savas in New York under the Hague Convention. It failed. He then attempted to re-serve on May 29, 2012, *after Defendant filed his motion to dismiss based upon so-called*

---

she will file against me an action and application for interim measures, which will be filed and tried in the US (since Georgianna Savas is an American Citizen and lives in New York, USA).

[15] Process was served in Greece first on his place of business on March 5, 2012 [D.E. 3], second on him personally by a Greek Bailiff on March 20, 2012 [D.E. 3-2] and finally by the Greek Ministry of Justice on him personally, on April 9, 2012. [D.E. 7.]

Opposition to Defendant's Motion to Dismiss
Page 13

'prior' litigation.[16]  Pl.Decl. ¶ 38.

Finally, it is untrue, as Defendant claims, that Mrs. Savas travelled to Greece to give testimony in two cases and "hand" him documents.  (Defendant admits elsewhere that the 2009 Agreement was sent, not hand-delivered, to him in Greece.  Def.Decl. ¶ 48.)  She did not travel to Greece to give any testimony.  She has not left the United States since January of 2009.  Defendant is also wholly incorrect in stating that the Mrs. Savas is fluent in Greek.   As Defendant's own letters admit, she is not.  She was born on the lower East Side, never studied Greek and speaks only a smattering of casual "street" phrases.  Pl. Decl. ¶ 39.

Thus, it is pure sophistry for Defendant to claim that there was any "prior" litigation:  (1) to which Mrs. Savas was a party[17], (2) which could determine any of the rights addressed here, and (3) where the issues were before a court of competent jurisdiction for such a proceeding.

## III.    Long-Arm Jurisdiction

The legal standard applicable to federal courts in cases that arise under the New York State long-arm statute is well-settled, as are the long-arm requirements. *See e.g. JP Morgan Chase Bank, N.A. v. Law Office of Robert Jay Gumenick, P.C.,* 2011 WL 1796298, 3-4 (S.D.N.Y. 2011).

> Pursuant to New York Civil Procedure Law and Rules ("CPLR") § 302(a), New York's long-arm jurisdiction statute, [a]s to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent:
>
> (1) transacts any business within the state or contracts anywhere to supply goods or

---

[16] That last service attempt appears to be invalid as well.

[17] Defendant attempts to make Mrs. Savas appear to somehow be a party in his other Greek actions.  This is simply not the case.  She is absolutely <u>not</u> a party to the other cases.  Defendant states that he initiated this litigation in 2008.  Def.Decl. ¶ 41.  The parties he claimed were selling forgeries responded with defamation claims.  Def.Decl. ¶¶ 51-2.  Mrs. Savas is not a party to any of these cases.  Defendant refers to a trial held "in these matters" on January 25, 2012.  Def.Decl. ¶ 44.  The transcript of this hearing shows that Defendant *did attempt* to implead Mrs. Savas, *which attempt was rejected out of hand by the Court*.  Yiannopoulos Decl. ¶ 35.

Opposition to Defendant's Motion to Dismiss
Page 14

services in the state; or

(2) commits a tortious act within the state ...; or

(3) commits a tortuous act without the state causing injury to any person or property within the state ..., if he

> (i) regularly does or solicits business, or engages in other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce;. .

Here, it is alleged that the defendant meets the requirements of all three of these subsections, as set forth below.

Although "conclusory allegations are not enough to establish personal jurisdiction" the pleadings and affidavits must be viewed in the light most favorable to the plaintiff, with all doubts resolved in her favor.

> [Where] the court does not conduct an evidentiary hearing on the issue of personal jurisdiction, "the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant." [*Citations omitted*.]. .
>
> To make this showing, a plaintiff may demonstrate " 'through [its] own affidavits and supporting materials, containing [a] [good faith] averment of facts that, if credited ..., would suffice to establish jurisdiction over the defendant.' " *[Citations omitted.]* In deciding whether the plaintiff has met this burden, the pleadings and affidavits must be viewed in the light most favorable to the plaintiff, with all doubts resolved in its favor. . "However, conclusory allegations are not enough to establish personal jurisdiction."

*DirecTV v. Park 610, LLC.*, 691 F.Supp.2d 405, 416-417 (S.D.N.Y. 2010).

### A.    Under 302(a)(3)(i) Defendant "commit[ed] a tortuous act without the state causing injury to [plaintiff] within the state" and  also "engage[d] in other persistent course of conduct. . ." within the State

Pursuant to CPLR § 302(a)(3)(i) a court may exercise personal jurisdiction over any non-domiciliary. .who in person or through an agent:

> (3) commits a tortuous act without the state causing injury to any person or property within the state. . ., if he

> (i) regularly does or solicits business, *or engages in other persistent course of conduct*, or derives substantial revenue from goods used or consumed or services rendered, in the state. .[Emphasis supplied.]

Opposition to Defendant's Motion to Dismiss
Page 15
_____

Defendant makes much of the difference between the long-arm requirement and due process concerns, but "persistent course of conduct" has been interpreted as being coextensive with the requirements of due process.[18]   In any case, in his effort to perpetrate the fraud — to obtain millions of dollars of art *without any payment or even a shred of documentation* — Defendant engaged in many activities into, affecting and in New York.  As described above:

- Defendant telephoned plaintiff in New York hundreds of times over several years. Pl.Decl. ¶ 40.
- He sent his agent to her house on several occasions over several years to select, collect and ship art as part of the fraud.  He had his agent receive, prepare, take and arrange for Defendant to ship hundreds of items of art in a long series of actions.  Pl.Decl. ¶ 42.
- He hired a New York lawyer who sent letters and e-mails from New York and made statements whose effect was to cover up the fraud, from New York.  The New York lawyer met with Mrs. Savas' son and representative in New York.
- Defendant was the publisher of art catalogues, which he shipped to New York to promote his art and stock brokerage businesses. J.Savas Decl. ¶ 14. ¶
- He has purchased works of Stamos and other artists in New York beginning in the 1990's from the following New York dealers and auction houses:
    - Hollis Taggart Galleries Bullaudy Decl. ¶ 12-3 and J.Savas Decl. ¶15
    - Sotheby's in New York
    - Kouros Galleries in New York
    - Debra Force and the galleries she managed
    - Michael Rosenfeld Gallery. *Id.*
- He threatened New Yore dealer if he even used the word 'Stamos' without permission. Pl.Ex. 4 and J.Savas Decl. ¶ 16.
- He threatened and auction house in New York about New York use of the Stamos copyrights, making explicit reference to the will and Assignment.  Pl.Ex. 6 and J.Savas Decl. ¶ 17.
- He asked Morfy Gikos, a New York City resident who spoke Greek fluently, to convey messages regarding these matters to Mrs. Savas in New York, as admitted by his New York lawyer.  Pl.Decl. ¶ 18.
- In 2008, he had his Greek friend an schoolmate who worked at the United Nations arrange for and meet Mrs. Savas at the Greek consulate, act as translator and provide a power of attorney to Defendant's Greek counsel, though Mrs. Savas had no understanding as to

_____

[18] To demonstrate the "minimum contacts" necessary to justify jurisdiction, plaintiff must show that the claim arises out of or relates to defendant's contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).  Also, whether the assertion of jurisdiction "comports with 'traditional notions of fair play and substantial justice'"—that is, whether it is reasonable under the circumstances of a particular case.  Here, the facts averred, discussed immediately below, meet this standard.

Case 1:12-cv-01248-VM   Document 15   Filed 06/08/12   Page 21 of 31
Opposition to Defendant's Motion to Dismiss
Page 16

what she was signing.  Pl.Decl. ¶ 43.

- He sent his daughter (who helps run his art collection) with her husband-to-be, Giorgios S. Kloudos, Esq. to New York City to the Hollis Taggart Gallery to claim that New York galleries were selling fake Stamos' in Greece.  Bullaudy Decl. ¶ 14-18.  Mr. Kloudos later appeared for Defendant in 2012 in the application for escrow proceeding.  [D.E. 11-1 at 15.]  J.Savas Decl. ¶ 19.
- He regularly used Soho to collect and ship art he purchased in New York City.

It would be hard to imagine what else the legislature might have intended to reach when it differentiated between "regularly does or solicits business" or "derives substantial revenue from goods used or consumed or services rendered, in the state" and "engages in other persistent course of conduct."  There "are few reported decisions construing this provision," however the disjunctive phrasing makes it clear that "the ongoing conduct contemplated by this alternative need not be business-related."  *Croskey v. Med. and Tech. Serv. Inc.*, 2006 WL 2347816, 4-5 (S.D.N.Y. 2006).  *See also Bank Brussels Lambert v. Fiddler Gonzalez*, 305 F.3d 120, 126 (2d. Cir. 2002).  Although this issue has not been explored in New York courts often,

> there is nothing in the plain language of § 302(a)(3)(i) which suggests that the relevant contacts must be solely business-related; in fact, this predicate's juxtaposition as an alternative to "regularly do[ing] or solicit[ing] business" suggests precisely the opposite...*[and] Granada Television, Int'l, Ltd. v. Lorindy Pics. Int'l Inc.,* 606 F.Supp. 68, 72 n. 5 (S.D.N.Y.1984) ("[T]he persistent course of conduct may involve a great range of human activity which, while it might fall beyond the pale of 'business' conduct, would, because of its consistency, serve as a solid link of jurisdiction to New York."). . .

Also, while Defendant tries desperately to make a distinction between his transactions involving a vast "art collection" and being an "art dealer," for the purposes of this section of the statute, that distinction (though not accurate) is of no import.  In *David Tunick, Inc. v. Kornfeld,* 813 F.Supp. 988, 991 (S.D.N.Y. 1993) this Court (Edelstein, J.) addressed a similar contention in the context of fraud in art interactions — dealing with similar Rule 12 and *forum non conveniens* arguments.  It took note of the fact that among other contacts "Mr. Kornfeld has purchased works of art for his personal collection from New York art galleries and collectors."

Opposition to Defendant's Motion to Dismiss
Page 17

Defendant's art inventory is also intimately involved with his brokerage business, and is housed on a floor at his stock brokerage firm in Athens (which bears his name.)  The name of his art brokerage firm is prominently displayed in his art catalogues and sponsored exhibits. Defendant openly cross-promotes his art and business.[19]  Decl. J. Savas ¶ 20.

**B.      Under ¶ 302(a)(1) Defendant has "transact[ed]. . .business within the state"**

As described above, Defendant is engaged in the international business of buying and selling art here in New York and elsewhere.  He actively competes with dealers regarding his sole right to authenticate Stamos works and by asserting that authentication right attempts to control their advertising and sales activities *in New York*.  He also sought to do this by controlling the Stamos *catalogue raisonne* - and it is highly unusual for a collector of art with a significant financial interest in the art (he claims to own 250 himself) to control the *catalogue raisonne*.  Decl. of J. Savas ¶ 21.

*1.  Transacted Business in the State by Warnings Based on the 2009 Assignment*

Under CPLR 302(a)(1), a court may exercise personal jurisdiction over a non-domiciliary defendant if that defendant "transacts any business within the state," as long as the "cause of action aris[es] from" the "acts which are the basis of jurisdiction." *Cenage Learning, Inc. v. Buckeye Books*, 531 F.Supp.2d 596 (S.D.N.Y. 2008).

> Judge Marrero of this court upheld a claim of specific (as opposed to general) jurisdiction over the defendants, who allegedly sold copyright-infringing merchandise over the Internet to customers in New York. *Pearson Education Inc., v. Shi,* 525 F.Supp.2d 551 (S.D.N.Y. 2007). Judge Marrero's reasoning applies to TRU as well. Because even one transaction is sufficient to subject a defendant to

---

[19] Defendant himself states in his moving papers that his art activities intertwine his business and personal interests.  "My name and my company's name along with the other Benefactors' and Supporters' names, appear at the entrance of the gallery."  Def.Decl. ¶ 7.  He also boasts of his organizing the retrospective show at Greece's National Gallery.  Def.Decl. ¶ 26.  The catalogue for that exhibition he references shows the sponsor as "ZACHARIAS G. PORTALAKIS **S.A.,** Member of the Athens Stock Exchange."  Thus he was promoting his business, the "S.A". "business corporation. Def.Decl. ¶ 11 and  Decl. J. Savas ¶ 23.

Opposition to Defendant's Motion to Dismiss
Page 18

> jurisdiction under a theory of transactional jurisdiction, *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 467 (1988)...Defendants' wholly conclusory argument to the contrary (including the contention that no cause of action arose from the sale of books into New York) is unpersuasive.

*Id.* at 531 F.Supp.2d 599. Mrs. Savas provides proof that he wrote to at least one art auction house in New York with such a warning about what could and could not be done *in New York* and explicitly referred to the New York will and the 2009 Assignment to do so. She believes that discovery will demonstrate this was part of a pervasive pattern. *See Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 527 N.Y.S.2d 195, 1 522 N.E.2d 40 (1988) and *Pearson Education Inc., v. Shi,* 525 F.Supp.2d 551 (S.D.N.Y. 2007) (single, related event is sufficient to create jurisdiction.)

### 2. Entered Into Contracts within the State Related to the Copyright claims

Defendant solicited the 2009 Assignment of copyrights from Mrs. Savas in New York, with regard to (what he himself now admits are) wholly non-Greek copyrights. (There are more Stamos works in the United States than in any other country, and accordingly United States copyrights are significantly implicated.) Pl.Decl. ¶ 44. The assignment was negotiated from, drafted and then executed in New York by Mrs. Savas, under U.S. and New York (not Greek law.) Pl.Ex. 12, 13 and 14; and Decl. of J. Savas ¶ 45. Thus, he has used the 2009 Assignment, explicitly referring to it and the New York will, in New York to threaten at least one New York dealer and at least one New York auction house about New York transactions. Pl.Ex. 6 and J.Savas Decl. ¶¶ 16 and 17.

### C. Under 302(a)(2) Defendant, by his own acts and the acts of his agent, "commit[ed] a tortious act within the state"

The central two acts of the fraud were the representations to her in New York, obtaining the Art Works in New York and shipping them out of New York. Although both Defendant and

Opposition to Defendant's Motion to Dismiss
Page 19

Mr. Gianakos now deny this[20] — there is more than a sufficient evidence of record, discussed

above, to support the following:

- Gianakos acted for Defendant with regard to art in New York for many years.
- Gianakos stated to Mrs. Savas that Defendant had asked him to arrange for the collection and shipment of the Art Works to Defendant.
- Gianakos went to the place where artwork belonging to plaintiff was located, sorted through it, received it for Defendant, arranged for it to be removed, and transported it to the shipper.
- Gianakos arranged for that packing and shipping and had customs and other paperwork completed.
- Gianakos arranged for Defendant to ship the Art Works to an Defendant's shipping broker/agent in Greece whose identity Mrs. Savas would have no way of knowing.
- The shipper Soho Crates has stated that Defendant was its client, that Mrs. Savas was not — and Soho's principal is a friend of Defendant.
- There is no dispute that Defendant, not Savas, paid for the shipment.

The acts that can subject a defendant to long-arm jurisdiction may be performed by the defendant

himself or "through an agent." *See, e.g., Owens v. Freeman*, 65 A.D.3d 731, 884 N.Y.S.2d 791

(3d Dep't, 2009), *leave to appeal dismissed* 13 N.Y.3d 855, 891 N.Y.S.2d 688, 920 N.E.2d 93.

Whether a representative qualifies as an agent for jurisdictional purposes does not turn on

legalistic distinctions and no showing of a formal relationship between the defendant and the

agent is required.  It is sufficient that the representative acted "for the benefit of and with the

knowledge and consent of [the] defendant and that [he or she] exercised some control over [the

agent] in the matter." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195,

199, 522 N.E.2d 40, 44 (1988).

---

[20] Gianakos who claims to be a close friend of Mrs. Savas provides an affidavit to support Defendant, while not revealing that he has said Defendant paid for the college education of Gianakos' child.  Further, the only time that Gianakos ever came to the home of Mrs. Savas to help in the selection and shipment of art was when the art was being shipped to Defendant -- he never appeared any other time to provide help of any type. Pl.Decl. ¶ 22 and J.Savas Decl. ¶ 23.

## IV.     Prior Actions, Forum Non Conveniens and Statue of Limitations

Defendant raises several other meritless objections to the Court's jurisdiction.

### A.        There is no prior litigation in Greece

There are two very different categories of Greek proceedings that Defendant attempts to blur: (1) the pre-2012 litigation as to which Mrs. Savas is not a party, and (2) the 2012 litigation as described above. None of this litigation may properly be described as prior litigation either as to these issues or as being between the parties.

#### 1. The Pre-2012 Litigation

The first category relates to pre-2012 forgery cases initiated by Defendant, and the defamation "counterclaims." Mrs. Savas is not a party to those cases, does not own and has never owned the two paintings in question, and her 250 paintings at issue here are **never** referred to therein. Her rights are not at issue and cannot be determined thereunder. As Defendant acknowledged in his September 12, 2011 letter, the Stamos copyrights are not involved in any way in those cases. Pl.Ex. 1. She has nothing to do with the cases. Thus, the pre-2012 Greek litigation is unrelated to the present case, the Art Works, Mrs. Savas' property or her rights.

#### 2. The 2012 Litigation

The second category relates to the 2012 attempts by Defendant to bring Mrs. Savas before the Greek courts.

##### a)        The Escrow Ex Parte Application of January 10, 2012

The only existing litigation that (by calendar date) could conceivably (but does not) qualify as a prior action is Defendant's January 10, 2012 escrow application. Yiannopoulos Decl. ¶¶ 26, 29. First, and most importantly, that application did not request that magistrate's court to determine any matters at issue here: the magistrate's court was not asked to determine ownership, it was not asked to address all of the art at issue here, and it was not asked to

determine the validity of the 2009 Copyright Assignment.  Yiannopoulos Decl. ¶ 9.

Defendant filed a copy of that escrow application with his motion.  [D.E. 11-1.]  On its face, it is obvious from the words of the escrow application that a determination of the rights of the parties was not requested.  [D.E. 11-1.]

Second, Defendant filed the escrow application in a local court having no jurisdiction to determine matters in excess of 20,000 €, *while falsely asserting that the value of all of the 233 works was under 18,000 €.*  [D.E. 11-1 at 8.]  Yiannopoulos Decl. ¶ 24-5.  Single Stamos works are valued substantially over that amount.  Pl.Ex. 15 and 16.

Third, accordingly, under Greek law, if a party does not contest such an escrow of property, there is no effect on the ultimate rights of the party to the property.  Yiannopoulos Decl. ¶¶ 19, 38.

Fourth, the application was filed *ex parte.*

Fifth, Defendant did not provide notice prior to the application's initial order.  *Id.*

Sixth, Mrs. Savas did not join issue in the matter.  Even had she joined issue, that would still not convert the case into an action determining issues never presented to the court. Had those issues been presented, the Greek court patently had no jurisdiction.  While a temporary Greek attorney did *attend* what he had heard at the last moment was scheduled to be a hearing, he did so only for the purpose of objecting to jurisdiction.  However, no hearing was (or has been) held and no statements were made or submitted by such counsel.  Under Greek law, a scheduled hearing that doesn't proceed isn't considered a hearing at all.[21] Yiannopoulos Decl. ¶ 8.

---

[21] Further, under Greek law, a person is not deemed to have "appeared with counsel" unless the hearings of the case "initiate."  Yiannopoulos Decl. ¶ 39. The pending petition's hearings were initially fixed for February 16, 2012, then for March 1, 2012 and eventually for July 24, 2012. Should Mrs. Savas decide not to attend the June hearing, the only consequence is that these items

Opposition to Defendant's Motion to Dismiss
Page 22

b)    The New Case Served May 29, 2012

As discussed above, Defendant attempted to serve a new, 55-page complaint on Mrs. Savas on May 29, 2012.  Pl.Decl. ¶ 38 and  J.Savas Decl. ¶24.  This new case can hardly be "pre-existing" because it was not filed, much less served on her Savas *until after* the summons and complaint in the instant case were served.  (Service was attempted after the instant motion to dismiss.)  Nor does the argument that the 55-page complaint was somehow an "extension" of the January 10, 2012 escrow application have any merit.  Yiannopoulos Decl. ¶ 38.  The new complaint was filed in a different court.  It raises different subjects and asks for completely different type of relief.

In any event, concurrent jurisdiction in two courts does not result in a conflict. <u>*Laker v. Sabena*</u>, 731 F.2d 909, 926 (D.C. Cir. 1984).  First, the "prior" Greek action was both ex parte[22] and *in rem* litigation.  Even were Mrs. Savas a party, when two sovereigns have concurrent *in personam* jurisdiction one court will ordinarily not interfere with or try to restrain proceedings before the other. *Donovan v. City of Dallas,* 377 U.S. 408, 412, 84 S.Ct. 1579, 1582, 12 L.Ed.2d 409 (1964), citing *Princess Lida of Thurn and Taxis v. Thompson,* 305 U.S. 456, 466, 59 S.Ct. 275, 280, 83 L.Ed. 285 (1939) and *Laker v. Sabena*; *Compagnie des Bauxites v. Insurance Co. of N. Am.,* 651 F.2d 877 (3d Cir. 1981). "[P]arallel proceedings on the same *in personam* claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as *res judicata* in the other," *Laker v. Sabena* at 926–27, *citing Colorado River Water Conservation District v. United States,* 424 U.S. 800, 817 (1976).

The local Greek magistrate could not (and did not) enjoin further *in personam*

---

are placed in conservatorship with no determination of the ownership rights of any parties by that court of limited jurisdiction. *Id.*

[22] The Magistrate's escrow orders of January 16 and March 1, 2012 were *ex parte.* D.E. 11-1 at 13.  Service was not attempted under the Hague Convention until April 9, 2012.  Pl.Decl. ¶ 37.

proceedings in that *in rem* proceeding.  Yiannopoulos Decl. ¶_20-23.  (Even if this were not true,

Mrs. Savas would then ask the Court to address the long-standing exception to the usual rule

tolerating concurrent efforts to stop a valid *in personam* action through an *in rem* or *quasi in rem*

based proceeding where the party here was not a party there.  Such an effort would pose a threat

to this Court's jurisdiction.)  *Donovan v. City of Dallas,* 377 U.S. 408, 84 S.Ct. 1579, 12 L.Ed.2d

409 (1964), *citing Princess Lida of Thurn & Taxis v. Thompson,* 305 U.S. 456, 59 S.Ct. 275, 83

L.Ed. 285.  The proper response would be an anti-suit injunction, not acceptance of interference.

### B.  Forum Non Conveniens

Defendant makes the sweeping claim there that he and all of the critical witnesses are in

Greece and it would cost much to ship art for inspection.  But he does not identify any such

witnesses, and Plaintiff's counsel would have no problem taking his deposition and having

artwork inventoried and inspected there by its experts.

> The party arguing for dismissal on this basis of *forum non conveniens* **bears a heavy burden**, and courts considering dismissal must assess multiple public and private factors.  The private factors to be considered include the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241 n. 6, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). The public factors include "administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Id.* (citing Gulf Oil. . . .)

*Moskowitz v. La Suisse, Societe D'Assurances sur la Vie*, 2012 WL 1080125, 3 (S.D.N.Y. 2012).

The private factors are obvious.  Except for Defendant, all of the significant witnesses to the

fraudulent representations (to Mrs. Savas from Defendant and Gianakos, and from Defendant

through Ms. Gikos in New York) are in New York.  So were most actions to accomplish the

Opposition to Defendant's Motion to Dismiss
Page 24

fraud (and the evidence thereof such as the movement of the Art Works and the efforts to cover up the fraud). The New York witnesses include Mrs. Savas, her son Jason Savas, Morfy Gikos, Sofia Stratis, Arthur Mannarino, Nicholas Patouris, Louis Meisel, Michael Gitlin, Vivian Bullaudy, Soho Crates and Mr. Cristos Gianakos. The two most important witnesses are New York residents Soho Crates and Mr. Gianakos. Shipping/customs records are in the United States. This information and their attendance would be unavailable under Greek discovery. Yiannopoulos Decl. ¶¶ 30-34. Finally, Mrs. Savas is 85 years old, is being treated for a heart condition, has high blood pressure and had a severe fall last year and can no longer travel as would be required. She has not traveled outside of the U.S. since January 2009. A trial in Greece would be impossible for her and mean multiple 12-hour trips. J.Savas Decl. ¶ 2.

The public factors involve the Greek judicial system in relation to peculiarities of this case. There are strikes and slowdowns by attorneys and court personnel, overloaded dockets, frequent adjournments and it is not possible to know if a case will be heard until the day of trial. Yiannopoulos Decl. ¶¶ 30-34. The European Court has found repeatedly that delays in Greek courts violated human rights. There is no pre-trial case management by the court to allow reliable scheduling. Pre-trial depositions are not allowed as a practical matter, and thus all New York witnesses would need to travel to Greece to testify. Yiannopoulos Decl. ¶¶ 30-34. Mrs. Savas would be unable to compel critical New York witnesses to so travel.

### C.   Statute of Limitations

Under CPLR § 214 "an action based upon fraud; the time within which the action must be commenced shall be the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." The representations were made and the Art Works were obtained within that time period, during March to October 2006 and for

Case 1:12-cv-01248-VM   Document 15   Filed 06/08/12   Page 30 of 31
Opposition to Defendant's Motion to Dismiss
Page 25

later works from 2006 to 2009. Even then this fraud was well hidden.  The statute of limitations

should not be decided summarily.  *See e.g. Saphir Intern SA v. UBS PaineWebber Inc., 25*

*A.D.3d 315, 315-316, 807 N.Y.S.2d 58, 59-60 (1st Dep't 2006).*

> This inquiry involves a mixed question of law and fact, and, where it does not
> conclusively appear that a plaintiff had knowledge of facts from which the alleged
> fraud might be reasonably inferred, the cause of action should not be disposed of
> summarily on statute of limitations grounds. Instead, the question is one for the
> trier-of-fact. [Emphasis supplied.]

That Defendant certainly had engaged in fraudulent representations from 2006 through

2009 is amply demonstrated by his letter of October 5, 2011 to Mrs. Savas in which he

recapitulates his many lies and misrepresentations to Mrs. Savas over time.  Pl.Ex. 1.  He indicts

himself.  He portrays himself as a highly trusted person in Greece and holding gallery art shows

and publishing catalogues of art he owned.  Although his Declaration reveals motive at that time,

from 2006 to the present there was no reason for Mrs. Savas to suspect Defendant was

attempting to keep the Art Works as his own.  Mrs. Savas only began in 2011 to understand the

existence of a fraud.  It cannot be said that it "conclusively appear[s] that [this] plaintiff had

knowledge of facts from which the alleged fraud might be reasonably inferred."[23]

**V.      Conclusion**

The motion to dismiss should be denied, or the Court should allow limited

jurisdictional discovery.

---

[23] As for the alternative claim of conversion, Defendant is simply incorrect as a matter of fact
and law.  Conversion occurs when dominion is asserted.  Mrs. Savas has invited Defendant to
provide evidence that he claimed ownership, asserted dominion over the objects prior to 2011.
Defendant was affirming her ownership and promising return as recently as January of 2012.

Opposition to Defendant's Motion to Dismiss
Page 26

**Dated:** June 8, 2012
New York, New York

_____/s_____

**Alan D. Sugarman**
(ADS-1209)
17 West. 70th St., Ste. 4
New York, NY 10023-4544
Phone: 212-873-1371
sugarman@sugarlaw.com

*Attorney for Plaintiff*

*Of Counsel*

Carl J. Hartmann III, Esq.
5000 Estate Coakley Bay, L-6
Christiansted, VI 00820
Phone: 340-642-4422
carl@carlhartmann.com

# CERTIFICATE OF SERVICE

Counsel for the parties are both subscribed to the CM/ECF system.  Service on opposing counsel was made by filing a copy of this document on the ECF system on June 8, 2012.

_____/s/_____

**Alan D. Sugarman**