UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――― X

GEORGIANNA SAVAS,   12 cv 1248 (VM)
   ECF CASE
*Plaintiff,*

-against-   Declaration of
   Jason Savas

ZACHARIAS GEORGIOU PORTALAKIS,

*Defendant.*

―――――――――――――――――――――――― X

I, Jason Savas, hereby declare:

1. I am the son of the Plaintiff Georgianna Savas, and the nephew of the artist Stamos. I have always lived in New York City. In 2010-11, because of the illness of my mother and father, I spent every day at my parents home taking care of them. I became aware of the situation between my mother and Defendant in early 2011. Since that time, at her request, I have spent hundreds of hours learning about the situation and learning about the art world as it relates to my uncle's works. My mother does not have e-mail so I sent and received e-mails on her behalf. I have also attended meetings on her behalf.

2. My mother is 85 years old, and is being treated for a heart condition, high blood pressure and had a severe fall last year — and can no longer travel to any significant extent. She has not traveled outside of the U.S. since January 2009. A trial in Greece would be impossible as it would mean multiple 12-hour trips.

3. It was well known that Mr. Gianakos had acted for Defendant many times in the purchase and acquisition of art in New York City. Several people have told me this.

4. After discovering the problems with Defendant in 2011, my mother spoke to Mr. Giannakos and he got together with us to talk. After some small talk we got down to the issues. Mr. Giannakos told us Defendant wanted him to convey that Defendant had not and would not do anything wrong. As evidence of Defendant's honest nature, Mr. Gianakos volunteered that Defendant had paid for his daughter, Maia's, college education at Vassar.

5. At the time of that discussion, we tried to pin Mr. Giannakos down as to what was shipped to Defendant. He stated that he did not remember much, or exactly how many total canvases and other objects there were, but that "there was a significant number." As to the Rothko drawings he selected and shipped, Mr. Gianakos said: "I don't remember the exact number." When my mother mentioned that she thought he had selected 7 or 8, Giannakos stated: "something like that."

6.      In November of 2011, Morfy Gikos stated to me and my mother that Defendant had just told her that he had obtained "the Rothkos" from my mother at the time the Art Works were shipped. I also understand that Mr. Gianakos was instrumental in acquiring Stamos works from Michael Rosenfeld Gallery in New York, on behalf of Defendant, in 2002. Defendant immediately placed those works into his gallery's 2002 Stamos Biomorphic Show.

7.      Defendant's gallery published an Edition of Mr. Gianakos' works in 2003. A true and accurate copy of the printout of that page is Exhibit Pl.Ex. 33. Gianakos omitted this item on the lengthy C.V. he attached as 'Exhibit A' to his Declaration in support of this motion. [D.E. 12-1].

8.      My mother called Soho Crates to set up an appointment -- and I visited Soho Crates ("Soho") -- in September or October of 2011. I drove there with 2 friends who waited outside in the car. Mr. Michael Gitlin, who runs Soho, met with me. Mr. Gitlin stated that has done a lot of shipping for the Defendant. I was there at least a half hour talking with Mr. Gitlin who had a female employee look through the computer records. There were no records of any of shipments by my mother to Greece. However, I did notice that on his computer there were entries for Defendant. It is clear to me that all of those shipments of the Art Works were made in Defendant's name and for his account.

9.      After these meetings, I asked my attorney to contact Soho to further attempt to obtain Soho's records relating to the Art Works. Repeated recent efforts to obtain the shipping information from Soho have been to no avail. However, Soho has stated in writing that it ships for Defendant. Exhibit Pl.Ex. 10 is a true and accurate copy of one such piece of that correspondence.

10.     Photos of a few of the shipping labels, which I obtained from Defendant's court filings, show that the crates were sent by Soho, were addressed to Defendant's Athens shipping agent (Athanasios Bergeles) and had Defendant's name handwritten on the crates. Some labels are blacked-out as to additional information. Exhibits Pl.Ex. 7, 8 and 9 are true and accurate copies of those photographs.

11.     Defendant sent me a letter dated October 5, 2011, stating that he had retained a New York attorney, Nicholas Patouris. Exhibit Pl.Ex. 23 is a true and accurate copy of that letter. After weeks of efforts by me to get together with Mr. Patouris, as suggested by Defendant (*see* Exhibits Pl.Ex. 25 and 26, which is a true and accurate copies of that correspondence) I finally met alone with Mr. Patouris in the lawyer's New York office.

12.     On December 20, 2011, my mother and I continued our efforts to obtain the property. Exhibit Pl.Ex. 30 is a true and accurate copy of that. We then sent another letter on December 31, 2011. Exhibit Pl. Ex. 31 is a true and accurate copy of that letter. After five weeks of silence, on January 6, 2012, Defendant's New York counsel (Patouris) e-mailed, promising a return of the items, and that, before January 17, 2012, a "full list" of the Art Works would be sent. Exhibit Pl.Ex. 2 is a true and accurate copy of that email. He stated:

> I am writing at the request of my client in Greece to confirm the following:
>
> 1. He is confirming that on or about January 17, 2012, he will provide you with a full list of the items in his possession that he wishes to return to your mother;
>
> 2. On or about that date he will have completed photographing those items and will provide you with copies of those photographs.

> 3. He wishes to have this matter closed amicably and finally, as Morfy has assured you.
>
> I will be in touch with you as soon as I hear from Greece.

13. Instead, unbeknownst to me or my mother, a few days later (on January 10, 2012) Defendant made an *ex parte* "application" in a local Greek municipal court of limited jurisdiction (with a maximum jurisdiction of 20,000 €) seeking only an *in rem* interim escrow by a museum as to just a portion of the Art Works held by Defendant.

14. I have discovered that Defendant was the publisher of art catalogues, which he shipped to New York to promote his art and stock brokerage businesses.

15. I have confirmed that Defendant purchased works of Stamos and other artists in New York beginning in the 1990's and continuing to the present from the following New York dealers and auction houses:

- Hollis Taggart Galleries. *See also* the Bullaudy Decl ¶ 12.
- Sotheby's in New York
- Kouros Galleries in New York
- Debra Force and the galleries she managed
- Michael Rosenfeld Gallery

16. Defendant threatened a prominent NY art dealer, Louis Meisel, if he even used the name 'Stamos' without permission. Exhibit Pl.Ex. 4 is a true and accurate copy of a document that reflects this. Meisel is well known to me and my mother. He knew my Uncle Stamos from 1954. My mother and father knew him from approximately 1976. He is the preeminent expert in the world regarding the works of Stamos.

17. Defendant threatened at least one New York auction house by a letter sent to New York. Exhibit Pl. Ex. 6 is a true and accurate copy of a document I was given and told had been filed in other court proceedings as an authentic copy of a document received from Bonham.

18. Defendant frequently asked Morfy Gikos, a New York City resident who spoke Greek fluently, to convey messages regarding these matters to my mother in New York, as admitted by his New York lawyer.

19. Defendant sent his daughter (who helps run his art collection) with her husband-to-be, Giorgios S. Kloudos, to New York City to the Hollis Taggart Gallery to claim that New York galleries were selling fake Stamos. *See* the Bullaudy Decl. ¶¶ 14-18. Mr. Kloudos later appeared as attorney for Defendant in the application for escrow Defendant raises in this matter. Page 15 of D.E. 11-1.

20. I have investigated this matter and have learned that Defendant's art gallery is intimately involved with his brokerage business. As examples, my mother visited the gallery on the floor at his stock brokerage firm in Athens (which bears his name) many times. Also, the name of his brokerage firm is prominently displayed in his art catalogues and has sponsored art exhibits of his holdings. Thus, Defendant openly cross-promotes his art and business.

21. I have investigated and found that Defendant is engaged in the international art business here in New York and elsewhere, as he: actively competes with dealers regarding his sole right to authenticate Stamos works and by asserting that authentication right attempts to

control their advertising and sales activities *in New York*. He also sought to do this by controlling the Stamos *catalogue raisonne* which would have a major effect here — two major New York dealers told me that it would have such an effect here and that it is highly unusual for a collector of an art with a significant financial interest in the art (he claims to own 250 himself) to control the *catalogue raisonne*.

22.     Defendant repeatedly promised to provide a "full list" of the Art Works — to inventory the works. Exhibit Pl.Ex. 2 is a true and accurate copy of one such promise. But he has never done so. He has merely provided 78 pages of unidentified photographs of only the front of *some* of the Art Works — and characterized the photographs as a list. It is *grossly* incomplete and does not provide even the most basic necessary information. The photographs are small and unclear (3 to a page.) Most have no photographs of the backs of the paintings, where frequently names of works, dates, signatures, and provenance labels appear. One would have to be an art expert even to be able to ascertain that the five Rothko pieces are not in the photographs — much less what pieces are, or are not there.

23.     Defendant states in his moving papers that his art activities intertwine his business and personal interests. He refers to "My name and my company's name" appearing together. He also boasts in his moving papers of his organizing a retrospective show at Greece's National Gallery. I have investigated this. The catalogue for that exhibition he references shows the sponsor as "ZACHARIAS G. PORTALAKIS S.A., Member of the Athens Stock Exchange." Thus the exhibition he claims he sponsored was actually sponsored by his company. Exhibit Pl.Ex. 11 is a true and accurate copy of front pages thereof.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
**DECLARANT**
**Jason Savas**

Executed: June 8, 2012, New York, New York