UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

GEORGIANNA SAVAS,

                     *Plaintiff,*

                  -against-

ZACHARIAS GEORGIOU PORTALAKIS,

                     *Defendant.*

------------------------------------------------------- X

12 cv 1248 (VM)
ECF CASE

Declaration of
Georgianna Savas

      Georgianna Savas hereby declares:

      1.    The "Art Works" at issue in this case are works of art and personal objects with a value of several millions of dollars. They were given or bequeathed to me by my brother, the New York artist Theodoros Stamos ("Stamos"). I am 85 years old and have lived my whole life in New York. Between 2006 and 2010, I loaned those approximately 250 Art Works to Defendant in reliance on his repeated representations from 2002 through October of 2009 that he would build a private museum with a wing to display the works, along with many Stamos works he showed me, which he told me he owned. The paintings were picked up, crated and then shipped by Soho Crates ("Soho") of New York City to Defendant. The Defendant arranged for and paid for those pickups and the crating and shipping. Soho acknowledges that shipments were made on behalf of Defendant. Pl.Ex. 10 is a true and accurate copy of a document in my possession as to this. The museum was never built and I have seen or heard of no plans by Defendant to build such a museum.

      2.    In 2011, I asked for the return of the Art Works. Defendant initially agreed to return them to me, both in writing and in verbal communications through New York resident Morfy Gikos, a life-long friend of Defendant's twin sister. Exhibits Pl.Ex. 23 and Pl.Ex. 2 are true and accurate copies of documents in my possession as to this.

      3.    In January of 2012, Defendant, for the first time, made the claim that he owned the Art Works. He had never made this claim to me or anyone else I had heard from before. I was never paid for or received any consideration for such a transfer. There are no writings making or suggesting any transfers or "gifts" of the Art Works to him. There are no writings that discuss any intent to give these Art Works to a foundation which Defendant was to create or any other person or entity. No copy of foundation documents or the 2009 Copyright Assignment I have ever seen mentions transfers of any art work to Defendant or the to-be-created foundation or anyone else. Discussion of the creation of a foundation came only *after* the shipment of many of the Art Works to Defendant began in 2006.

4. Stamos had a New York will. It was probated in New York. Under his New York will, I inherited his copyrights, but this did not include any Stamos copyrights applicable to or within Greece. The 2009 Assignment of these non-Greek copyrights was made, on its face, to Defendant *solely* for further transfer to a "government-approved" foundation that Defendant promised to establish, and only could be exercised after such approval.

5. If Defendant used these assigned copyrights in litigation to which I am not a party, he lied to me about it both in a letter and at many earlier times when he made similar statements to me. Any use of the copyrights in litigation was without my authorization, and would be a clear violation of the language on the face of that Assignment. Further, I have heard or received nothing that suggests he has started a *catalogue raisonne*. Exhibit Pl.Ex. 1 is a true and accurate copy of a document in my possession with regard to this.

6. The only relationship I am aware of between the Art Works and the copyrights is the new, false statement by Defendant (made in in 2012) that the 2009 Assignment somehow transferred art, and he now owns the Art Works under that 2009 Assignment.

7. My brother related the facts to me regarding Defendant meeting him in the late 1980's towards the end of his life. He was ill during that period. He died in 1997. Stamos was a close friend and associate of Rothko, and was born and raised in New York. He lived his entire life in New York except for vacations in Greece, where he met Defendant. I never heard anything from my brother to suggest that he saw Defendant on any occasions except those vacations.

8. During this time, Defendant attempted to obtain: (1) control of Stamos' copyrights, (2) a right to authenticate his works, (3) possession of a number of his works located in Greece, and control of the Stamos *catalogue raisonne*. Finally, in late 1995, a little over a year before Stamos' death in 1997, Defendant persuaded Stamos to handwrite what was essentially a holographic will. Pl.Decl. Def.Decl. ¶ 21.

9. In 1997 my brother executed his last will and testament. It was a New York will probated in New York. Prior writings, such as the 1995 writing which I never saw until 2002 or 2003, were revoked by the will. The will devised all real and personal property to me — except for such property in Greece, which went to a cousin who lived in Greece. The will did not mention Defendant. Exhibit Pl.Ex. 1 is a true and accurate copy of a document in my possession sent to me by Defendant.

10. I did not meet the Defendant until just before Stamos' death. I now understand that beginning at that time Defendant set out to obtain the art and copyrights. He quickly befriended me, although I have read in his Declaration that this was a charade -- he clearly felt at the time he was entitled to the art and copyrights. It is apparent from what he says in his Declaration (Def.Decl ¶¶ 23 and 24) that he held a deep enmity towards me then -- for having 'talked my brother out of' what Defendant thought he should get for free.

11. During the period from 1997 to 2006, Defendant was solicitous and charming, calling me in New York hundreds of times.

12. Defendant held art exhibits of his own Stamos works and made me an honorary guest at exhibits he held. He paid for publishing my memoir about my brother, making changes and suggestions so he was *extravagantly* praised in the book. He flattered me — and repeatedly and continuously promised me between 1997 and 2006, that if I loaned him the Art Works he would show them (along with numerous Stamos works he said he owned and many of which he showed to me) in a wing of a museum he represented he would build.

13. He invited me to Greece in 2002, to see the location he had purchased to build the museum. We then discussed that location again in 2006 just before he obtained the Art Works. In 2009 I was invited to be an honorary guest at a Stamos show, and he told me the work on the museum was underway. At this show he pressured me to sign legal documents written in Greek with no translations. Through that representation, he obtained my devotion, the loan of the Art Works, and the assignment of the copyrights.

14. During the time period from July 2006 through October of 2006, Defendant represented that he would select, collect, ship, inventory and store the Art Works to be loaned to the museum.

15. I know as a certainty that the representations were made at that specific time because both my husband and myself were ill at that time and were concerned about the future. Defendant also represented that in order to select and move the art to Greece, his agent for dealing with his art activities in New York, Mr. Cristos Gianakos, would come go through what I had, take the Art Works and arrange for Defendant's shipment of them to Greece. Though known to me, Mr. Gianakos had never assisted me with moving or shipping of any art or with any other business or other similar activity at any time — ever. The only times he ever came into my apartment or home (to my best recollection) were to ship the Art Works to Defendant.

16. I knew Mr. Gianakos and others that knew him. It was well known at that time (2006) that Mr. Gianakos had acted for Defendant many times in the purchase and acquisition of art in New York City. Mr. Gianakos is so close to Defendant that, as Mr. Gianakos told me himself (and others) Defendant had paid a substantial portion of the cost for Mr. Gianakos' daughter, Maia's, education at Vassar. I have now discovered that Defendant also published an Edition of his work in 2003. Exhibit Pl.Ex. 33 is a true and accurate copy of a document that reflects this.

17. Almost all of the Art Works were provided in New York to Mr. Gianakos on several occasions between October of 2006 and 2009 — beginning on October 15, 2006.

18. Defendant then shipped the objects from New York using Soho Crates ("Soho") which I understood, from Mr. Gianakos at the time, Defendant had used many times previously.

19. I did not arrange for, or pay for the pick-up at my house or the shipment to Greece. The items were picked up from me and I was told at the time by both Defendant and Mr. Gianakos that the pick-up, crating and shipping costs for the shipments were being arranged for and paid for by Defendant. My involvement was merely signing a pick-up receipt.

20. I never received any inventory of the art shipped from Soho by Defendant. Nor did Soho or Defendant supply me with copies of the U.S. customs declarations or anything to indicate each work of art, the size and value.

21. The only time that I was ever directly or indirectly involved with Soho and Mr. Gianakos with regard to shipping or any other business activity concerned shipments of art to Defendant. I never used Soho Crates for my shipping to others or for my loans and gifts to museums and galleries.

22. Neither Soho nor Mr. Gianakos were in any way involved in my moving and shipping of loans of art to The National Gallery of Greece in 1997, the United States "Art in Embassies Program" in Athens in 1998, the 70th Art Gallery in New York in 2000, the Queens Museum in 2000, shows in Greece in 2000, the Meisel Gallery in 2002, the Ashville Art Museum in 2002, Marymount in New York City in 2005, the Westchester Art Workshop in 2006, and the Hollis Taggart Gallery in 2010. Nor were either involved in the handling and

shipping of donated works by my brother to the twenty U.S. museums from 2009 to 2011. Mr. Gianakos was not there to help me with moving art from my brother's home on West 83rd Street after his death or in moving art from my home to Stamos' old apartment. Thus, Mr. Gianakos and Soho only were on the scene regarding shipping on the occasions when this Art Work was being shipped to Defendant.

23. In 2006-2009, I had no way of knowing Bergeles was the receiving agent for Defendant in Greece, or its address.

24. By May of 2011: (1) I had no information that suggested the museum with a 'Stamos wing' being built or even planned, (2) I had no information suggesting that the Greek government had approved the Foundation, (3) I had recently received information that the copyrights were being misused for Defendant's personal ends, rather than for the foundation and (4) I had received no information suggesting that the *catalogue raisonne* had ever been even started.

25. As I later learned in 2012, after we looked into the matter, the Greek Ministry of Finance had already declined to approve the Foundation as being underfunded — and has not reconsidered the application since then. I never interfered with the foundation approval in any way prior to 2012. I had no contact with them before 2012. My first and only contact with the Ministry was in February, 2012 — after the fraud had been understood. On May 11, 2011, I politely wrote to Defendant expressing concerns about the Art Works and the lack of the promised museum.

26. Exhibits Pl.Ex. 18 and 19 are true and accurate copies of documents in my possession which relate to this May 11, 2011 letter. I could not follow up on my requests for several months as I was bedridden for several weeks after a fall -- and my husband had taken a turn for the worse. He died from cancer a few months later on August 20, 2011.

27. On August 28, 2011, I again wrote Defendant, expressing grave concerns about learning that he was indeed using references to the Assignment to attempt to involve me in his Greek litigation. Exhibit Pl.Ex. 20 is a true and accurate copy of that.

28. On September 6, 2011, I wrote again, this time objecting to Defendant's personal use of the copyrights about which I had been warned. Exhibit Pl.Ex. 32 is a true and accurate copy of that.

29. On September 12, 2011, Defendant responded with a long letter in English explicitly denying that he used the Assignment or copyrights in any the Greek litigation he discusses in his motion or in any litigation. Exhibit Pl.Ex. 1 is a true and accurate copy of that letter from Defendant to me. He also admitted that my assignments of copyright were not applicable to Greece or his Greek litigation, and that he had no copyrights in Greece:

> As far as the copyrights are concerned, as the lawyer states very correctly, for the rest of the world except Greece, you gave them to me only to transfer them to the Stamos Foundation, and never to use them personally. This is anyway prohibited by the document of May 13, 2009.

Defendant was also clear in stating to me that he had not used the copyrights or Assignment in any court of law:

> I repeat, I have never used the copyrights in any court of law and for any reason. Even if I want to, I cannot use them personally.

In response, I notified Defendant that the Assignment was being terminated. Exhibit Pl.Ex. 21 is a true and accurate copy of that.

30. Fearing now for the first time that the museum representations had been a sham to get the Art Works, I wrote Defendant on October 3, 2011, demanding a return of all of the Art Works stating:

> [It is]important that everything that I sent to you to store for me for the museum that was planned over 15 years ago, that has never happened, be returned to America.

Exhibit Pl.Ex. 1 is a true and accurate copy of that.

31. On November 5, 2011, when nothing was forthcoming from Defendant's attorney (Patouris), I again wrote Defendant, demanding the immediate return of the Art Works and asking for an inventory of all of my property he was holding. Exhibit Pl.Ex. 27 is a true and accurate copy of that.

32. Defendant and his New York counsel responded on December 1, 2011, with more misrepresentations, but failed to supply the property or promised inventory. Exhibit Pl.Ex. 29 is a true and accurate copy of that.

33. Thus, my sole contact with the pre-2012 Greek litigation he discusses in his motion came on December 9, 2011, when I signed an affidavit in New York intended to make it clear that I was not a party to any of his Greek litigation.

34. I absolutely did not travel to Greece and testify in court nor was a deposition or other testimony from me taken anywhere else.

35. In the application filed January 10, 2012 Defendant stated, *for the first time ever*, his claim to *own* the approximately 233 pieces out of the approximately 250 Art Works. He did not mention or provide the disposition of the other 17 missing works.

36. On January 19, 2012, Defendant's New York attorney (Patouris), sent us an email on advising that an "order" had been issued by the Greek court. He did not include any papers. He only vaguely identified the court, and did not even give me the docket number of the case. He did not disclose that Defendant had changed his position and was now claiming ownership of the Art Works. He did not provide the promised "full list." Exhibit Pl.Ex. 5 is a true and accurate copy of that.

37. *It is a huge falsehood that Defendant stated to the Greek Court -- that the value of all of the 233 works was 18,000 €.* They are worth millions. If the 5 works by Rothko are included, which does not appear to be the case, that amount is even higher. (Nor did he even attempt to serve me until months later on April 9, 2012.) I first learned of this nine days after that, when Patouris sent the email to my son.

38. After Patouris' January 19, 2012 email, I then hired litigation counsel in New York. On February 17, 2012, I filed this case. On May 16, 2012, Defendant attempted to have papers served upon me in New York. It failed. He then attempted to re-serve me on May 29, 2012. That failed as well.

39. I have never travelled to Greece to give testimony, nor did I, as he declares here, "hand" Defendant documents at such a time -- as that would be impossible because I was in New York. The 2009 Agreement was sent by a delivery service (with a requirement that the recipient sign for it) not hand-delivered, to him in Greece. I have not left the United States since January

of 2009. I am not fluent in Greek -- I cannot read it or write it. I was born on the lower East Side, never studied Greek and speak only a smattering of casual phrases.

40. Defendant telephoned me in New York hundreds of times over the years 1997 to 2006.

41. He sent the person he identified as his agent, Mr. Gianakos, whom I knew but with whom I had never conducted any shipping or any other business, to my house on several occasions over several years to collect art to ship to him beginning on October 15, 2006. He had the person he told me was his agent for doing this, Mr. Gianakos receive, prepare, take and arrange for Defendant to ship hundreds of items of art in a long series of actions.

42. Defendant hired a New York lawyer (Patouris) who sent letters and e-mails from New York and made statements the effect of which was covering up the fraud.

43. In 2008, Defendant had his Greek friend and schoolmate, Roula Froussi, who worked for the Greek Mission at the United Nations: make arrangements, meet me at the Greek consulate, act as translator and provide a power of attorney to Defendant's Greek counsel, though I had no understanding as to what I was signing.

44. Defendant solicited from me, while I was in New York State, the 2009 Assignment of copyrights with regard to my copyrights. (I believe that there are more Stamos works in the United States than in any other country.)

45. The 2009 Assignment was negotiated from, drafted in and then executed in New York by me, under U.S. and New York (not Greek law.) Exhibits Pl.Ex. 12, 13 and 14 are true and accurate copies of documents that relate to this.

46. I do not possess a complete copy of the original 2009 Assignment with all attachments, and Defendant has not provided me such a complete copy. The escrow application filed with Defendant's motion appends an altered version of the Assignment. Exhibit Pl.Ex. 14 is a true and accurate copy of a document which demonstrates this. Defendant's submission includes an unexecuted version -- different from Pl.Ex. 12, 13 and 14 -- and is without attachments. Accordingly, I do not acknowledge that the Assignment appended is a valid document.

47. Defendant claims that he paid for Stamos' health care. However, my brother suffered no lack of funds. Moreover, in the escrow application filed with his motion, Defendant claims he purchased over 250 works of art directly from my brother near that time. [D.E. 11-1] at 2. The estate received neither any such funds nor any art from Defendant after my brother's death. If he had paid for those works, then Stamos certainly would not have lacked for funds. I have never seen any documents evidencing a sale of such a large number of works to Defendant.

48. I know Morfy Gikos who is a friend of Defendant and lives in New York and is completely fluent in Greek and English. Defendant used Gikos as his intermediary in New York to communicate representations and messages regarding this matter to me on many occasions. Exhibits Pl.Ex. 1 and 23 are true and accurate copies of documents regarding this in my possession.

49. For tax reasons, I could not have given such works to a Greek entity without disastrous consequences. I had previously discussed with Defendant the fact that I had been unwilling to complete donations of my brother's paintings to The National Museum of Contemporary Art in Athens after the Museum advised me in 2002 that it did not and could not possess a U.S. tax-exemption. Exhibit Pl.Ex. 3 is a true and accurate copy of a document that

reflects this. Defendant knew that his promised museum and any Greek foundation could not have such a U.S. tax-exemption. He also knew from this and other conversations with me that I was fully aware of the applicability of U.S. gift taxes and thus could not give art of any value to a non-tax-exempt entity. Defendant further knew that starting in 2008, with the help of the Hollis Taggart Galleries, I had been donating many of my brother's important works to U.S. museums such as the Whitney, the National Gallery, and the Phillips Collection -- gifts to which *could* provide such tax relief. Exhibits Pl.Ex. 15 and 16 are true and accurate copies that reflect this. Indeed, I now realize, but did not realize at the time, that these last documents show a transfer of copyrights to these museums after the 2009 Assignment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
**DECLARANT**
**Georgianna Savas**

**Executed:** June 7, 2012, New York, New York